Thomas ROSARIO, Ovidio Vega and Ray Cabel, Plaintiffs-Appellees,

v.

AMALGAMATED LADIES' GARMENT CUTTERS' UNION, LOCAL 10, I.L.G. W.U., Abe Dolgen, Individually and as Manager of Amalgamated Ladies' Garment Cutters' Union, Local 10, I.L.G. W.U., Defendant-Appellants,

and

The City of New York, Defendant-Appellee.

Thomas ROSARIO, Ovidio Vega and Ray Cabel, Plaintiffs-Appellees,

v.

AMALGAMATED LADIES' GARMENT CUTTERS' UNION, LOCAL 10, I.L.G. W.U., and International Ladies' Garment Workers' Union, AFL–CIO, Defendants-Appellants.

Nos. 344, 522 and 523, Dockets 78–7335 to 78–7337.

United States Court of Appeals, Second Circuit.

Argued Jan. 17, 1979.

Decided July 17, 1979.

Simon H. Rifkind, New York City (Jay H. Topkis, Richard M. Zuckerman, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel), for defendant-appellant Amalgamated Ladies' Garment Cutters' Union, Local 10, I.L.G.W.U.

Stephen C. Vladeck, New York City (Judith P. Broach, Lawrence M. Sapadin, Paul L. Shapiro, New York City, on the brief), for defendant-appellant Abe Dolgen, individually.

Max Zimny, New York City (Ann F. Hoffman, New York City, of counsel), for defendant-appellant International Ladies' Garment Workers' Union, AFL–CIO.

Burton H. Hall, New York City, for plaintiffs-appellees.

Before MOORE and MANSFIELD, Circuit Judges, and WYATT,* District Judge.

MANSFIELD, Circuit Judge:

Local 10 of the International Ladies' Garment Workers Union (ILGWU) and the ILGWU itself (both of which are sometimes collectively referred to herein as the "Union") are joined with Abe Dolgen, former Manager of Local 10, as defendants in two consolidated actions brought in the Southern District of New York by appellees, three members of Local 10, under § 102 of the Labor Management Reporting and Disclosure Act (LMRDA, the Landrum-Griffin Act, or the Act), 29 U.S.C. § 412, seeking nullification of certain union disciplinary proceedings and damages for violations of procedural and substantive rights under § 101 of the Act, 29 U.S.C. § 411, and seeking damages under pendent state tort claims.[1] These three defendants appeal from an order and judgment entered by Judge Constance Baker Motley after a grant of partial summary judgment and a jury trial of the remaining issues, permanently enjoining Local 10 from following certain procedures in disciplining its members and awarding compensatory and punitive damages against Local 10 and Dolgen.

The actions arose out of an altercation between appellees and Dolgen on January 29, 1975, in Dolgen's Local 10 office and a series of ensuing disciplinary proceedings against appellees conducted by Local 10 and the International. Appellees claimed that Local 10 and the ILGWU deprived them of the full and fair hearing required by § 101(a)(5)(C), by (1) remanding the disciplinary charges for retrial before essentially the same tribunal that had previously found them guilty and by (2) denying appellees the right to tape-record the proceedings at their own expense when the union did not provide for a verbatim record.[2] Appellees also claimed that the sanction imposed—suspension of the right to attend membership meetings—violated § 101(a)(1), the "equal rights" provision of the Act. In addition, appellees Rosario and Vega, invoking the court's pendent jurisdiction, advanced claims against Dolgen and the City of New York for false arrest and against Dolgen for malicious prosecution.[3]

In a pretrial decision, reported at 441 F.Supp. 657, Judge Motley ruled that the challenged union trial procedures and sanction violated § 101. Accordingly she set

---

* Of the United States District Court for the Southern District of New York, sitting by designation.

1. For purposes of this appeal we treat the two complaints as one.

2. In a separate decision, also issued today, we address the question of whether a union member has a right to tape-record his disciplinary proceeding when the union does provide for a verbatim transcription. *Feltington v. Moving*

*Picture Machine Operators Union Local 306, post.*

3. Prior to trial appellees voluntarily discontinued their claims against the City of New York, whereupon these claims were dismissed. At the same time Judge Motley, asserting discretion to decline to exercise jurisdiction over pendent claims, dismissed without prejudice Dolgen's cross-claims against the City seeking contribution toward the false arrest claim.

aside the disciplinary conviction and permanently enjoined Local 10 and the ILGWU from committing such violations.[4] Appellees' remaining claims for compensatory and punitive damages were submitted to the jury in the form of special interrogatories. The jury found that appellees were injured by Local 10's violations of § 101 but that Local 10 had not disciplined appellees in retaliation for their political opposition to the Local's leadership. The jury further found that Dolgen had not contributed to the § 101 violations but had "acting under color of his authority as manager of the union, and not in his individual capacity as a complaining union member, dominated and manipulated the trial and their resultant punishment in order to get revenge against [appellees]." The jury also found Dolgen liable for false arrest and malicious prosecution.[5]

We affirm the judgment below insofar as it holds (1) that a union may not under § 101 allow a member of a union tribunal which had convicted a union member to participate as a member of the tribunal upon a retrial of the same charges and (2)

that a union may not prevent an accused from recording disciplinary proceedings when the union itself does not provide a verbatim record. We also affirm the judgment against Dolgen for false arrest and malicious prosecution. We reverse the decision that a union may not as a disciplinary sanction suspend a member's right to attend membership meetings. We set aside the damage awards against Local 10 and Dolgen on the federal claims on the grounds they were predicated in part on an erroneous legal theory and unsupported by sufficient evidence.

Since the tortuous background to this litigation is well described in Judge Motley's reported opinion, 441 F.Supp. at 661–70, we confine ourselves to facts essential to our opinion. Appellees had for several years prior to the events giving rise to this litigation been vocal critics of the management of Local 10 and in particular of Abe Dolgen, its manager.[6] On January 29, 1975, appellees met with Dolgen in his office to discuss employment in the cutting trades and alleged discrimination in job referrals by

---

**4.** Judge Motley dismissed the LMRDA claims against Dolgen, insofar as they sought relief for acts he unofficially committed, on the ground that that Act provides relief only against persons acting in an official capacity. See 441 F.Supp. at 657–76. Appellees have not cross-appealed this dismissal.

**5.** The jury awarded damages as follows:

*Against Dolgen:*

| | Compensatory | Punitive |
| --- | --- | --- |
| False Arrest: | | |
| Rosario | $1,000 | $2,500 |
| Vega | 1,000 | 2,500 |
| Malicious Prosecution: | | |
| Rosario | 2,500 | 0 |
| Vega | 1,500 | 0 |
| Wrongful Discipline (LMRDA claim): | | |
| Rosario | 500 | 2,500 |
| Vega | 500 | 2,500 |
| Cabel | 500 | 2,500 |

*Against Local 10:*

| | Compensatory | Punitive |
| --- | --- | --- |
| Wrongful Discipline (LMRDA claim): | | |
| Rosario | 1,000 | 10,000 |
| Vega | 1,000 | 10,000 |
| Cable | 1,000 | 10,000 |

---

Judge Motley ruled that appellees were entitled to recover from Local 10 attorney's fees in an amount that remains to be determined, attributable to prosecution of their claims for declaratory judgment on the § 101 claims.

**6.** Dolgen retired from his position with Local 10 on July 1, 1976, having served as Manager for eight years and in various capacities for a total of 37 years.

Local 10's business agents. A heated argument took place, following which Dolgen and five other officials of Local 10 who had entered Dolgen's office during the discussions jointly left the room and returned moments later with two police officers. In the meantime appellee Cabel had departed to attend to some personal business. One of the policemen advised Rosario that Dolgen wanted him and Vega to leave. Rosario, startled, attempted to explain the situation but his remonstrance was cut short when Dolgen insisted that Rosario and Vega be arrested, declaring that he would press charges, and demanded that Cabel be tracked down and arrested.[7] Meanwhile Dolgen's five fellow officials were allegedly lined across the doorway to his small office, preventing appellees from leaving voluntarily and intensifying the intimidating atmosphere.

Rosario and Vega were handcuffed and searched by the arresting officer and taken to the police station in a squad car in the custody of two other police officers who arrived on the scene. At the station the police made one and possibly two calls to Local 10's office and were told that charges would be pressed. Rosario and Vega were each given an "Appearance Ticket," an instrument issuable by a police officer in a non-felony case, directing each individual to appear in the local criminal court at a specified time for a specified charge. See N.Y. Crim.Pro.L. § 150.10, *et seq.* (McKinney). About two weeks later, Rosario and Vega appeared as directed in Criminal Court and, after spending several hours waiting as the case was repeatedly called, were told they could go home since the complainant had not appeared.

On February 10, 1975, the very day when Rosario and Vega appeared in court, Dol-

gen, "acting in his individual capacity," filed intraunion disciplinary charges with Local 10 against them and Cabel, accusing them in multiple counts of interference with union operations and of conduct unbecoming a union member, in violation of the ILGWU's constitution.[8]

On February 25, 1975, appellees were tried before the Executive Board of Local 10 sitting as a grievance committee, found guilty and sentenced to a one-year suspension of their right to participate in union membership meetings. They appealed this conviction to the Appeal Committee of the General Executive Board (GEB) of the ILGWU, claiming that Dolgen and some of his witnesses had participated in the deliberations of the trial body. The Appeal Committee, while declaring that this claim had not been established, nevertheless vacated the conviction to avoid any appearance of impropriety. Dolgen then promptly preferred identical new charges against appellees, which were heard on May 21, 1975 by the Local 10 Executive Board, several members of which had been on the Board when it heard the same charges in February. Again the Committee unanimously found appellees guilty as charged.

Appellees again appealed to the GEB's Appeal Committee, claiming that the tribunal was biased and that Dolgen had "maliciously" dominated the proceedings. They also protested the ruling of the trial body prohibiting them from tape-recording the proceedings and from examining the official minutes of the trial.[9] This time the Appeal Committee affirmed the conviction, ruling that the claim of bias or prejudice on the part of the second trial body was unsupported by evidence and could not be based simply on the fact that essentially the same group of individuals had decided the same

---

7. Evidently Cabel was never arrested.

8. The charges and the relevant constitutional provisions are set out at 441 F.Supp. at 661, n. 2.

9. At both of the first two trials one of appellees brought a tape recorder, which he was told he could not use. However, Rosario covertly recorded the trial proceedings with another ma-

chine. Appellees contend that their surreptitious recording of the first trial reveals that the official minutes, read to them at the appeal, were inaccurate in significant respects. The minutes of the first trial were taken by Nat Klein, Secretary of Local 10's Executive Board; those of the second trial were taken by another member of the Board.

charges before. The Appeal Committee also rejected appellees' other claims and approved the Trial Committee's ruling that an accused union member is not entitled to examine a copy of the trial minutes or tape-record the proceedings.[10]

At this juncture, appellees in September, 1975, filed suit in the federal court against appellants under LMRDA and state tort law. Shortly thereafter the GEB, *sua sponte*, reviewed the decision of the Appeal Committee and directed the Trial Committee to conduct a new trial under certain specified conditions, principally that the tribunal consist of rank-and-file union members having no previous involvement with the case and that the Committee designate a secretary to take minutes, which would be available to all parties.[11] The members of this trial committee were elected by an open hand vote at the next regularly scheduled membership meeting, held on November 24, 1975. Appellees later alleged in their federal action that Local 10 did not adequately notify the membership of this meeting, with the result that the attendance was unusually low and most of those present were firm supporters of the incumbent management. Appellees also allege that the tribunal was hand-picked by Dolgen and his colleagues. Not surprisingly, appellants deny these allegations.

On December 18, 1975, the scheduled trial date, appellees, whose request for transcripts of the two previous trials for preparation purposes had been denied by the Trial Committee, appeared with their tape recorders in hand. The hearing was ad-

journed to January 8, 1976, when an impasse developed over use of the tape recorder. Appellees and their lay counsel returned on the new trial date, still insisting upon their right to use the tape recorder. The Trial Committee thereupon retired to an adjoining room and tried appellees *in absentia*.[12] By written decision dated January 29, 1976, the Trial Committee convicted appellees of the specifications of misconduct that were common to all three appellees and suspended their right to attend meetings, Rosario and Vega for 18 months and Cabel for one year. Appellees again appealed to the GEB, but the hearing of the appeal was adjourned *sine die* when appellees refused to desist from using their tape recorder.

At this point, July, 1976, appellees filed their second federal action with a complaint that in essence incorporated allegations concerning the third union trial into the federal claims asserted in the first action. In August 1976 Judge Motley granted appellees a preliminary injunction barring Local 10 from carrying out the punishment imposed by the third Trial Committee. Appellants took an appeal to this Court, which on November 9, 1976, affirmed from the bench the issuance of the injunction.

Following the issuance of the injunction, the battle returned to the union halls, where on December 14, 1976, the Executive Committee of the GEB, acting *sua sponte* in response to the federal court rulings, ordered that "the appeal from [the] charges [filed by Dolgen] shall be heard and deter-

10. Under the ILGWU constitution, the trial minutes are not shown to either the charging party or the defendant but are forwarded to the Appeal Committee if an appeal is taken and are read to the defendant at the appeal hearing, at which time he can point out alleged errors in the minutes.

Appellees did not appear at the appeal hearing following the second trial, but rested on written submissions. The Appeal Committee sustained the prohibition against use of a tape recorder on the ground that under the Union's constitution the minutes as prepared by the trial or appeal body represent the one and only official record of a disciplinary proceeding. The Committee took note of the susceptibility

of tape recordings to falsification. See 441 F.Supp. at 663–64, nn. 5, 6.

11. Under art. 23, § 5 of the ILGWU constitution, the only appeal of right from a decision of the Appeal Committee is to the next triennial or special convention of the ILGWU, which for appellees meant waiting until May, 1977. However, the GEB may on its own motion review a decision of the Appeal Committee, and the GEB's decision is appealable to the convention.

12. The parties dispute whether appellees were locked out of the room in which the Trial Committee conducted the hearing or whether they were free to enter *sans* the tape recorder.

mined by a Special Appeal Committee of the General Executive Board." The Executive Committee's "decision" specified that the Special Appeal Committee was to consist of five ILGWU vice-presidents and that "[t]he appeal from the Trial Committee's decision of January 29, 1976, [was to] be a hearing *de novo* by the Special Appeal Committee." The parties, moreover, were to be accorded the right to be represented by counsel, to present any relevant evidence, to cross-examine witnesses, and to make opening and closing statements; appellees were to be furnished with a copy of the minutes of all previous trial and appellate hearings, and the proceedings of the "*de novo* appeal" were to be transcribed by a certified shorthand reporter.[13]

Appellees responded to the Executive Committee's decision with a letter to the Committee denouncing the "*de novo* hearing" as a form of harassment contrived to retaliate against them for pursuing their rights in federal court. Having, in their opinion, exhausted their intraunion appellate remedies, appellees announced in their letter that they would not attend the hearing. The Special Appeal Committee replied with a reminder of the time and place of the "hearing *de novo* on [the] appeal" and with a reference to Art. 22, § 4 of the ILGWU constitution, quoted in the letter, captioned "Failure to appear at trial," which provides that if an accused fails to appear for trial without good excuse, the trial body may proceed as if he were present.

No further communications occurred until the Special Appeal Committee on April 11, 1977, sent appellees a copy of the stenographic transcript of a hearing that had been held by it as announced on March 23, 1977, and a copy of the Statement and Decision of the Committee, which found appellees guilty of the common charges of misconduct and adopted the sanction imposed by the Third Trial Committee.[14] The

cover letter, which called attention to appellees' right to appeal to the next convention of the ILGWU, scheduled for May, 1977, referred to the hearing held by the Special Appeal Committee as a "*de novo* trial." In reply Rosario wrote the Committee denying that it had authority under the ILGWU constitution to conduct a trial, asserting that it had authority only to hear appeals and that hearing an appeal from the Trial Committee's decision would be in contempt of the district court's preliminary injunction.

In May, 1977, appellees moved in the district court for an order holding the ILGWU in contempt of the September 20, 1976, injunction barring execution of the disciplinary sanction. This motion was denied by Judge Motley. Appellees then pursued their ultimate intraunion appellate remedy, filing an appeal to the Convention. Appellees asserted in the alternative that the ruling of the Special Appeal Committee, if an appeal, did not cure the defects in the trial procedure and, if a trial, was *ultra vires*. Appellees did not attend the hearing before the Appeal Committee of the Convention, despite concededly adequate notice. The Committee recommended affirmance of the conviction, and the Convention unanimously ratified this recommendation.

On November 14, 1977, Judge Motley filed her decision granting summary judgment awarding permanent injunctive relief against Local 10 and the ILGWU on the ground that they had violated appellees' rights by barring them from attending Union meetings, by denying them a full and fair hearing at the first two Union trials, by refusing to permit them to record the proceedings, and by permitting retrial of the same charges against them before the same tribunal. Judge Motley also dismissed the claims of § 101 violations against Dolgen on the ground that he had acted in a private, not in an official, capacity, and denied Local 10's motion to dismiss appellees' claims that

---

**13.** This decision was distributed to appellees with a cover letter stating that the decision was "in connection with the appeal" taken by appellees.

**14.** The Special Appeal Committee did not consider the count preferred against Cabel alone, which had been dismissed by the third Trial Committee.

the Union's disciplinary punishment violated 29 U.S.C. § 529. In April, 1978, the remaining claims, including those for compensatory and punitive damages for the denials of appellees' right to attend Union meetings and of a full and fair hearing of the charges against them, plus the false arrest and malicious prosecution claims against Dolgen, were tried before a jury, which answered special questions. This led to entry of the judgments, including a direction that reasonable attorney's fees be awarded, from which defendants appeal.

## DISCUSSION

### I. FEDERAL LAW CLAIMS

#### (a) *Whether a Union May Suspend a Member's Right to Attend Meetings*

We turn first to the question of whether the district court erred in holding that a union may not punish a member by suspending his right to attend membership meetings. The district court reasoned that such a "partial" suspension is not a form of discipline implicitly sanctioned by § 101(a)(5) of the LMRDA, since appellees remained union "members" as defined in § 3(*o*) of the Act, 29 U.S.C. § 402(*o*), and were therefore entitled to the equal rights guaranteed to "members" by § 101(a)(1), including the right "to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings." In support of this literalistic interpretation of the statutory language the court suggested that the seemingly mild sanction of barring a member from attending meetings might be abused by union officials eager to silence dissidents without provoking mistrust of other union members or of a federal court, which might occur if more dramatic sanctions such as expulsion or suspension of membership status were employed.

We are unaware of any cases clearly addressing the issue. *Stachan v. Weber*, 535 F.2d 1202 (9th Cir. 1976), cited by the district court and relied upon by appellees, is of no help. There the court simply ruled that union members who had refused to salute the flag and recite the pledge of allegiance at the opening of union meetings could not be excluded, since their conduct was protected under the free speech clause of § 101, 29 U.S.C. § 411(a)(2). Although the court's statement that the "exclusion would clearly violate the equal rights section of the Act," 535 F.2d at 1203, might conceivably be interpreted as prohibiting such a form of discipline, the more plausible interpretation is that the union could not exclude members from union meetings without first conducting a "full and fair" hearing on written charges brought under the union's constitution or by-laws. Other decisions cited by appellants for their position are likewise non-supportive. Indeed, in *Reyes v. Laborers' International Union, Local 16*, 464 F.2d 595 (10th Cir. 1972), *cert. denied*, 411 U.S. 915, 93 S.Ct. 1542, 36 L.Ed.2d 307 (1973), the court stated that it was "not moved by appellant's argument that the suspension from attending meetings violated his rights as a Union member. Suspension is expressly recognized in 29 U.S.C. § 411(a)(5) as one of the disciplinary actions for which the procedural safeguards must be afforded." 464 F.2d at 597.

We are persuaded that a union has the power under the LMRDA to discipline a member by suspending his right to attend membership meetings provided, of course, that he has been properly found after a full and fair hearing to have violated a legitimate union rule. Subsection (a)(5) does not restrict the form of discipline a union may impose; it guards against abusive and unjust exercise of union authority by prohibiting a union from disciplining a member without first affording him certain procedural safeguards against unwarranted or inaccurate adjudication. See *NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 194, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967); *Morrissey v. National Maritime Union*, 544 F.2d 19, 26 (2d Cir. 1976). As the senator who introduced the LMRDA stated, its objective "is to protect a man from being arbitrarily disciplined without a fair hearing and without the right to protect his livelihood. That is what it amounts to." 105 Cong.Rec. 5811 (daily ed., April 22, 1959) (remarks of Sen.

McClellan), reprinted in II NLRB *Legislative History of the Labor-Management Reporting and Disclosure Act of 1959* 1103 (hereinafter cited as *Legislative History*).

■ Nor does subsection 101(a)(1) of the LMRDA, the "equal rights" provision of that Act, support appellees' contention that a union member is absolutely entitled to exercise rights of membership, unrestricted by reasonable forms of discipline, since it expressly provides that the right to attend and participate in membership meetings is "subject to reasonable rules and regulations in [the union's] constitution and bylaws." Although this qualifying clause does not expressly address disciplinary sanctions and its primary purpose is to allow a union to adopt reasonable, uniform rules governing such matters as the exercise of the union franchise and parliamentary procedure, *see* H.Rep. 741, 86th Cong., 1st Sess. 29 (1959), reprinted in 1959 U.S.Code Cong. & Admin. News, pp. 2424, 2452, it does demonstrate that union membership does not confer an unqualified right to exercise rights of membership.

■ Nothing in the LMRDA, therefore, precludes a union from removing a disruptive member from a meeting without first expelling him from membership or suspending his membership. Extending this result to allow a union to deny a member admission to meetings for a reasonable period as punishment for a prior violation of a reasonable rule or regulation aimed at preventing disruption of union business is compatible with both the language and intent of the statute. In neither event is the union acting in some arbitrary fashion to suppress dissent or to sacrifice democracy in the interest of efficiency. Moreover, common sense dictates that a union should have the option of imposing a sanction less drastic than complete suspension when a member disrupts the conduct of union meetings or business. In enacting Title I of the LMRDA, Congress aimed to curb the autocratic rule of some union leaders by assuring union members of equal rights to participate in union affairs and the rights to speech and assembly and by preventing suppression of these rights through abuse of the union's disciplinary powers. Congress did not, however, desire to outlaw union discipline, *Morrissey, supra*, 544 F.2d at 26. Its aim was to prevent improperly motivated and conducted disciplinary proceedings.[15]

Viewing the statute in light of this purpose, any reasonable disciplinary sanction imposed in conformity with § 101(a)(5) is consistent with § 101(a)(1). The suspension of a union member's right to attend meetings cannot imperil union democracy or oppress the union member when the union would be entitled to suspend the member from membership altogether, as appellees concede would be the case here if they had been properly convicted of the charged offense.

■ The sinister theory that if union officials could resort to a narrowly-tailored discipline they would be more apt to use disciplinary machinery to suppress dissent than they would if they had to rely on the more drastic remedies of expulsion or total suspension is unpersuasive. A union member who believes he has been wrongfully disciplined may challenge the union's action under § 102 of the Act regardless of the severity of the sanction. No support is offered for the argument that partial suspension would arouse less suspicion on the part of members or of a reviewing court than would total suspension or expulsion. It may be that a literal reading of § 101 lends some support to the result reached by the district court. However, since "[t]he Bill of Rights that appears as Title I of the Act was hastily drafted and included without much debate," *Navarro v. Gannon*, 385 F.2d 512, 517 (2d Cir. 1967), *cert. denied*, 390 U.S. 989, 88 S.Ct. 1184, 19 L.Ed.2d 1294 (1968), we are more inclined to follow the

---

15. Under the partial suspension imposed in this case appellees continued to enjoy all the economic benefits of union membership (as well as the obligation to pay dues), such as participation in the union's health and pension plans. In addition, appellees retained the right to vote in union elections, to nominate candidates and to run for office, although these rights perhaps had little practical value to one barred from attending membership meetings.

practice of giving effect to the legislative purpose notwithstanding the literal wording of the statute. See, e. g., *Lynch v. Overholser*, 369 U.S. 705, 710, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962); *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489–90 (2d Cir. 1960).

(b) *The Right of an Accused Union Member to Record Union Disciplinary Proceedings Against Him*

We next turn to the question of whether a defendant in a union disciplinary proceeding has a right to record the proceeding at his own expense, electronically or stenographically, when the union does not do so. It is not disputed that at the first three union trials appellees were forbidden to use the tape recorder they had brought with them. Nor does the ILGWU suggest that appellees would have been allowed to have a stenographic record made had they retained a stenographer or court reporter. Throughout the proceedings the trial officials adamantly opposed appellees' desire to have a verbatim record maintained, arguing that an ILGWU constitutional provision requiring a trial committee to appoint a secretary to take notes of disciplinary proceedings proscribed any record other than the secretary's hand-taken notes. Judge Motley's holding to the contrary is supported by decisions of two other district courts which have considered the question, *Pawlak v. Greenawalt*, 464 F.Supp. 1265, 1271 (M.D. Pa.1979); *Kiepura v. Local 1091, USW*, 358 F.Supp. 987, 991–92 (N.D.Ill.1973).[16]

■ Appellees argue that requiring a union to permit a member to record the disciplinary proceeding is inconsistent with the general legislative policy of limited judicial intervention in union self-government, see *Newman v. Local 1101, CWA*, 570 F.2d 439, 445–46 (2d Cir. 1978), *opinion following remand*, 597 F.2d 833 (2d Cir. 1979), and with Congress' decision to delete from the bill which later became the Landrum-Griffin Act a proposal that would have required unions to prepare a transcript of every disciplinary proceeding. However, the national policy against judicial interference in the internal affairs of unions is "subject to important exception in specific areas in which Congress has found that the interests of individual members need special protection against the danger of overreaching by entrenched union leadership." *Rota v. Brotherhood of Railway, Airline & S.S. Clerks*, 489 F.2d 998, 1003 (7th Cir. 1973), *cert. denied*, 414 U.S. 1144, 94 S.Ct. 896, 39 L.Ed.2d 99 (1974); see *Wirtz v. Hotel, Motel & Club Employees Union, Local 6*, 391 U.S. 492, 496–97, 88 S.Ct. 1743, 20 L.Ed.2d 763 (1968); *Sheldon v. O'Callaghan*, 497 F.2d 1276, 1281 (2d Cir.), *cert. denied*, 419 U.S. 1090, 95 S.Ct. 681, 42 L.Ed.2d 682 (1974); *Tincher v. Piasecki*, 520 F.2d 851, 854 (7th Cir. 1975). The union member's bill of rights generally, including its full and fair hearing requirement, is one such area. While federal courts surely do not exercise "supervisory powers" over union tribunals they have the duty to insure that unions satisfy Congress' mandate of fairness in union disciplinary proceedings. To paraphrase *Wirtz v. Local 153, Glass Bottle Blowers Ass'n*, 389 U.S. 463, 471, 88 S.Ct. 1743, 20 L.Ed.2d 763 (1968), the freedom allowed unions to run their disciplinary proceedings was reserved for those proceedings which conform to the "due process" principles written into § 101(a)(5). See *Falcone v. Dantinne*, 420 F.2d 1157, 1164 (3d Cir. 1969).

■ The question of allowing a union member to tape-record his disciplinary proceeding, like the question of the composition of the trial body, does not raise merely a technical point of procedure, which is certainly within the union's discretion, or require us to review the sufficiency of the evidence or to interpret the union's constitution or by-laws. Compare *Internat. Bro. of Boilermakers v. Hardeman*, 401 U.S. 233, 242–46, 91 S.Ct. 609, 28 L.Ed.2d 10 (1971).

---

**16.** In *Pawlak* the court found that the union's refusal to allow the accused to tape-record the proceedings was not a ground for setting aside the results of the disciplinary trial since there were no disputed issues of fact, the only issue being whether the union could punish a member for the conduct that had admittedly occurred.

It does not, therefore, represent an unwarranted intrusion upon an area which Congress reserved to the unions.

Nor would our ruling on the question of tape-recording be inconsistent with Congress' rejection of a proposal that would have required unions to transcribe disciplinary proceedings. Early versions in the House and Senate of the union members' bill of rights contained a provision requiring that a verbatim record be made of the disciplinary proceeding. See H.R. 4473, § 101(a)(7)(xi), 86th Cong., 1st Sess. (1959), reprinted in I *Legislative History, supra*, at 179; S. 1137, § 101(7)(E), 86th Cong., 1st Sess. (1959), reprinted in *id.* at 270.[17] However, the provision was rejected as "cumbersome and unnecessary," since the bill provided for review of a disciplinary judgment by a federal court in a civil action brought by the aggrieved union member, which would decide whether "the rights of the union member [had] been protected. . . ." See 105 Cong.Rec. 6023 (daily ed., April 25, 1959) (remarks of Sen. Kuchel), reprinted in II *Legislative History, supra*, at 1232.[18] There is no suggestion that making of an accurate record for review by the neutral arbiter in appropriate cases was to be discouraged. Moreover, Congress' rejection of the proposal hardly resolves the issue before us, which is whether the *accused* may make a verbatim recording, not whether the *union* has an obligation to do so.[19]

Appellees' argument that permitting a union member to tape-record disciplinary proceedings against him would impose excessive financial burdens on unions is hardly persuasive, since it is the union member, not the union, who would assume the obligation of making the recording. Nor is there any force to the contention that the union would be required to make its own recording in order to protect against falsification of tapes by the accused. In most run-of-the-mill cases—those not involving disputes over union management—it is logical and likely that the member would accept the union's record, absent proof of a motive to falsify. In other cases there would be no factual dispute, in which event the union would have no occasion to worry about falsification of the record even if the accused were allowed to record the proceedings. See *Pawlak, supra*, 464 F.Supp. at 1271.

The notion that union members would possess the expertise or equipment needed to distort or falsify tapes, much less to prevent ready detection of such conduct, appears rather far-fetched. Where tapes are unreliable, either because of the possi-

---

17. The Senate bill provided that no member could be disciplined unless "afforded final review on a written transcript of the hearing, by an impartial person or persons. . . ." The House bill simply provided that a verbatim record of the proceeding should be made.

18. Senator Kuchel's explanation for amending the provision dealing with disciplinary proceedings is, in full:

"We believe, Mr. President, that language is clear and explicit, and provides the usual reasonable constitutional basis upon which charges might be brought. We believe further that the language in subdivision (6) of the amendment of the able Senator from Arkansas, upon which we voted the other night, did raise some rather vexing questions. For example, the McClellan amendment provided in part that there should be a final review on a written transcript of a hearing, by an impartial person or persons (i) agreed to by such organization and the accused, or (ii) designated by an independent arbitration or mediation association or board.

"We believe that is cumbersome and unnecessary language. Since we have provided not merely for a criminal penalty but, in addition, for a civil right on the part of the aggrieved member to go to court, we believe that the U.S. district court will be able to determine whether the rights of the union member have been protected and whether he has had constitutionally reasonable notice and a reasonable hearing, and whether the matter has been reasonably disposed of." H.R. 4473 was never considered on the floor of the House. The provision on disciplinary proceedings found in subsequent bills introduced in the House was either identical or substantially similar to the Kuchel amendment.

19. The comments, cited by appellants, of members of Congress criticizing the McClellan proposal address themselves to the intrusive review of disciplinary findings by a neutral arbiter rather than to the alleged burden of making a transcript.

bility of distortion or of unintelligibility, the union would be justified in disregarding them or giving them little weight. Where falsification is suspected, the union could easily require the accused member to place the tape under seal in the custody of a neutral body. The cost to the union of making its own recording in those few cases where it could not otherwise protect itself by one of the foregoing methods hardly approaches excessiveness.

Nor is there any merit in the Union's argument that taping of disciplinary proceedings by the accused would defeat Congress' desire to keep such proceedings informal. The operation of a tape-recorder is no more intrusive than the ILGWU's practice of requiring the Secretary of the Trial Committee[20] to keep notes of the trial proceeding, which the accused member is permitted to see and challenge only at the hearing on appeal. As a practical matter, a claim that official minutes made from scribbled handwritten notes are inaccurate would normally be entitled to much greater weight if based on a clear tape-recording of the proceedings than it would otherwise be, since the tape would usually be more accurate and complete than the notes. Whether or not the Union would be forced into matching the recording procedure adopted by the accused, cf. *Matthews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 83, 47 L.Ed.2d 18 (1976), the latter should not be deprived of an accurate record if he wants and is willing to obtain it at his own expense.

The suggestion that the tape-recording would impair union disciplinary proceedings borders on the frivolous. It is not uncommon today to tape-record proceedings of many different types (including all arguments of this court) without any intrusion or fanfare. The Union's contention that members would be reluctant to testify if the proceedings were tape-recorded not only implies that the witnesses would be reluctant to tell the truth but sheds doubt on the Union's own hearings. It also ig-

nores the established practice of recording (either by stenotype or tape) testimony given in most judicial proceedings.

Appellants' further argument— that disciplinary proceedings should be treated like collective bargaining sessions or grievance meetings, which are usually not recorded—overlooks the significant difference in the nature of the two types of proceedings. Because negotiation of contract terms and grievances requires each party to compromise some or all of its interests in order to achieve a settlement best for the group as a whole, negotiators realize that the bargaining process could easily be stymied if each of the multiple, heterogeneous constituencies they represent are apprised of the details of the process. Experience teaches that labor contracts, like international treaties, cannot be openly arrived at. See *St. Louis Typographical Union No. 8, ITU*, 149 N.L.R.B. No. 71 at 750, 754 (1964) (Fanning and Brown, concurring). Union disciplinary proceedings, in contrast, are comparable in several important respects to a criminal trial, where credibility is crucial and secrecy is utterly foreign to our concepts of fairness. As in criminal trials, witnesses in union disciplinary proceedings are more likely to testify truthfully and union boards more likely to conduct themselves properly if they know that an accurate record of their testimony can be scrutinized by others than if the sole record consists of sketchy notes made by a union official sympathetic to the union management. For all of these reasons we conclude that a union should allow an accused to record a disciplinary proceeding against him when the union does not.

(c) *Retrial of a Union Member on the Same Charges Before the Same Union Tribunal*

We turn next to appellants' challenge to Judge Motley's ruling that a union cannot consistently with the full and fair hearing requirement of § 101(a)(5) try a union member before a panel which includes one or more individuals who have previously heard

20. At the first trial minutes were taken by Nat Klein, Secretary of Local 10's Executive Board. At the two subsequent trials notes were taken

by someone apparently designated *ad hoc* to serve as secretary for the Trial Committee.

the identical charges and adjudged the accused to be guilty.

■ It cannot be denied that in a literal sense the members of the second tribunal, having found the accused guilty of the identical charges, have "prejudged" his guilt. However, appellants point out that a *per se* rule precluding such a retrial by the same body would impose on union disciplinary tribunals a higher standard of due process than courts have imposed upon themselves or upon administrative agencies, to which cases are sometimes remanded for new fact-finding by the same decision-maker after initial findings have been set aside. This argument disregards the fact that criminal charges, which are analogous to union disciplinary charges, are not upon remand tried to the same jury. It also fails to take into account the markedly different safeguards inherent in judicial and administrative adjudication, on the one hand, as distinguished from intraunion adjudication, on the other—a distinction we recognized in *Salzhandler v. Caputo*, 316 F.2d 445, 450 (2d Cir.), *cert. denied*, 375 U.S. 946, 84 S.Ct. 344, 11 L.Ed.2d 257 (1963).[21] The former are governed by rules of procedure and of evidence and are subject to a review designed to insure that only findings which are supported by substantial evidence will be upheld. On the other hand, union disciplinary proceedings, subject to the strictures of § 101(a)(5), are governed by a far less formal regimen and, except in extreme cases, are not reviewed in the federal courts for the sufficiency of the evidence.

■ The most compelling distinction, however, is that the judicial and administrative processes insist with much greater rigor than does intraunion disciplinary process upon the detachment of the adjudicators from the prosecutors. When union officials or members sympathetic to their continued tenure and interest in maintaining the status quo sit in judgment upon charges arising out of internal political differences, brought by a fellow official against a member who is critical of their policies, the atmosphere is hardly conducive to impartial resolution of the issues. See *Salzhandler, supra*, 316 F.2d at 450. If, in addition, the decision makers are laymen who (unlike a judge) have not been trained in professional commitment to an exacting, detached and disinterested appraisal of the evidence, there is the obvious danger that they will not be fair and impartial. This danger is compounded when the officials have previously adjudicated the charges. The risk is more than § 101(a)(5)(C) will tolerate, particularly in light of the ease with which a union can draw upon others not previously connected with the case in order to assemble a tribunal. Accordingly, we affirm the district court's decision that disciplinary charges cannot be heard upon remand for a new trial before those who previously heard the charges. See in accord *Cefalo v. Moffett*, 78 L.R.R.M. 2112 (D.D.C.1971).

The decisions in *Falcone v. Dantinne*, 420 F.2d 1157 (3rd Cir. 1969), and *Tincher v. Piasecki*, 520 F.2d 851 (7th Cir. 1975), relied upon by appellants (and by the district court in *Feltington v. Motion Picture Machine Operators Union Local 306*, 97 L.R. R.M. 2517 (S.D.N.Y.1977), *further opinion*, 97 L.R.R.M. 2522 (1978), which we today reverse) are not inconsistent with our decision in this case. In *Falcone* the three union officials constituting the trial body had participated in an informal hearing authorized by the union's constitution for the purpose of trying to settle the charges against the accused union member. When this failed the accused was tried and convicted. Upon an appeal by the accused from a dismissal of his action under § 102 the Third Circuit, reversing the district court, held that because one of the officials was biased against the accused, as was evidenced by his statements at the informal settlement hearing, the accused did not re-

---

21. We, of course, do not suggest that union members are immune from intraunion prosecution for disrupting union meetings or trespassing at union offices, even though they may be immune from internal prosecution for defaming a union official. See *Salzhandler, supra*. We cite *Salzhandler* for its recognition of inadequacies of most intraunion disciplinary procedures in dealing with politically charged accusations.

ceive the full and fair hearing guaranteed by § 101(a)(5) of the Act, and suggested that upon remand a wholly new trial body should be constituted for any retrial. See 420 F.2d at 1163, n.8. Although the majority opinion (specifically excepted to by one member of the panel) states that it was not inherently improper for a union official who participated in the settlement discussion to sit on the Trial Body, 420 F.2d at 1160–61, the informal settlement session, unlike the earlier trials in the present case, did not necessitate any fact-finding by the officials. Thus there is strong reason to believe that the *Falcone* court, faced with the facts before us, would agree with our conclusion.

Appellants' reliance on *Tincher* is far-fetched. There the court invalidated a union disciplinary proceeding on the ground that the tribunal had considered a report which it had prepared after convicting the accused at a prior trial, the result of which had been set aside because the accused had received inadequate notice of the charges against him. In a footnote the court mentioned that because the trial body had considered evidence and its conclusion from the first trial, the result of the second trial must be set aside even if it were "assum[ed] *arguendo* that it was not improper for the same trial committee to hear [the second trial]," citing footnote 8 in *Falcone*, which had suggested that upon retrial it would be improper for any members of the prior trial body or even for union officers present at the earlier trial to serve on the newly constituted trial body, 520 F.2d at 856, n.7. Far from indicating a rejection by the Seventh Circuit of a *per se* rule, the reasoning of the court in *Tincher* is tantamount to adoption of such a rule.

(d) *The Adequacy of the Fourth Disciplinary Proceeding*

▇ Appellants contend that, even assuming appellees' rights to a full and fair hearing were for the foregoing reasons denied at the first three disciplinary proceedings, the deficiencies were cured by the "*de novo* appeal" held on March 23, 1977. This contention was rejected by Judge Motley, who reasoned that appellees were entitled

to rely on her previously issued injunction barring Local 10 and the ILGWU from giving any force or effect to the January, 1976, decision of the Local 10 Trial Committee as barring the conduct of further intraunion review or reconsideration of the Trial Committee's decision. Although Judge Motley declined to hold the ILGWU in contempt of her injunction for holding the hearing before the Special Appeal Committee, she found that the Union had inadequately disclosed its intention to hold a new trial, so that appellees were entitled to ignore the summons. 441 F.Supp. at 672–73. We disagree.

Appellees had ample notice that the proceeding to be conducted by the Special Appeal Committee of the ILGWU's GEB would be a new trial and not merely a review of the results of the previous trial. The decision of the GEB directing that the proceeding take place, which was distributed to appellees well in advance of the hearing date, stipulated that the Committee would conduct a hearing "*de novo*," with the parties entitled to be present and represented by counsel, to present documentary and testimonial evidence, to cross-examine witnesses and make opening and closing statements. Although GEB referred to the Board's action as one in connection with appellees' "appeal" and described the proceeding as "the hearing *de novo* on appeal" the substance of the message was clear: appellees were being offered a trial with all of the due process rights previously denied. If there was any doubt about the nature of the new proceeding, appellees had ample opportunity to clarify the matter. Instead they chose to boycott the proceeding. While their doubts about the Union's sincerity may be understandable, their failure to respond, either by accepting the offer or by asking the court's assistance to insure that a genuine full and fair trial *ab initio* would be held, is not.

Despite appellees' suspicions, there is no evidence that the Board's purpose was other than to comply with the district court's injunction. Nevertheless, although the fourth disciplinary hearing must be viewed

as a full and fair hearing within the meaning of the Act, it does not necessarily wipe out any harm caused to appellees by the Union's denial of fair hearings in their cases for over a period of almost two years. Nor is there any reason to believe that, absent injunctive relief, the defendants, who granted the *de novo* hearing in an obvious effort to mitigate the effect of the district court's decision, will not in the future resume the foregoing procedures in violation of the rights of appellees or other union members. We must also consider whether appellees suffered any damages as a result of the Union's earlier violations of their rights.

(e) *Damages*

(1) *Local 10 and ILGWU*

██ A union member who has been disciplined in violation of § 101 may recover damages for stigmatization, loss of earnings or similar harm caused by the wrongful conviction, see, e. g., *Bradford v. Textile Workers, Local 1093*, 563 F.2d 1138, 1144 (4th Cir. 1977); *Internat. Bro. of Boilermakers v. Braswell*, 388 F.2d 193, 199 (9th Cir. 1968); *Simmons v. Avisco, Local 713, Textile Workers Union*, 350 F.2d 1012, 1018 (4th Cir. 1965), and if the charges were prosecuted in bad faith or for an improper motive such as retaliation, for harm attributable to the prosecution itself, even if the member was acquitted or his conviction was reversed on appeal within the union or to a court. Although a question may exist as to whether damages are recoverable for mental or emotional distress attributable to denial of due process in the absence of some other form of harm, see *Carey v. Piphus*, 435 U.S. 247, 263–64, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), we need not, for reasons indicated below, decide that issue in this case.

██ In the present case the jury awarded damages against Local 10 for mental distress attributable (without differentiation) to imposition of a sanction erroneously found by the district court to have been unlawful (suspension from attendance at union meetings) and to retrials before the same union tribunal.[22] The jury's assessment of these damages (compensatory and punitive) must be reversed because it is predicated upon the erroneous theory that partial suspension was an improper disciplinary sanction. See *Morrissey, supra*, 544 F.2d at 26–27. Indeed, since the jury found that the Union's prosecution of appellees was not in retaliation for their dissident political views, Local 10 presumably had a proper motive for bringing the charges to trial and there is no indication that appellees' distress was caused by lack of procedural due process. Although intangible damages, such as mental distress, are not susceptible to exacting proof, a plaintiff must offer some evidence that the reputed injury was causally connected to the defendant's wrongdoing. Appellees failed to meet this burden. Nor did appellees except to Judge Motley's instruction that punitive damages cannot be awarded in the absence of compensatory damages. For these reasons the jury's assessment of damages against Local 10 must be set aside.

██ The district court's determination that attorney's fees may be awarded against Local 10 in favor of appellees' counsel stands on a different footing. Such an award is within the court's traditional equity power where the plaintiff confers a substantial benefit on the union's general membership, since "by vindicating his own

---

**22.** Judge Motley ruled prior to trial that appellees could not recover damages resulting from the wrongful denial of the right to record the proceedings because there was no precedent giving Local 10 fair notice of this right.

The special interrogatory posed to the jury on the claim for damages against Local 10 for the LMRDA violations was phrased as follows: "If you answered Yes to Question 5, finding Local 10 liable to the plaintiffs because of the violations of federal law which the court found

had occurred in connection with the second trial and because of the illegal suspension from attending union meetings, what amount do you award plaintiffs for the harm they suffered against Local 10?" The jury here was not asked whether appellees were injured by the conviction and exclusion from membership meetings, and the jury explicitly found that Local 10 did not prosecute appellees for purposes of retaliation.

right, the successful litigant dispels the 'chill' cast upon the rights of others. Indeed, to the extent that such lawsuits contribute to the preservation of union democracy, they frequently prove beneficial 'not only in the immediate impact of the results achieved but in their implications for the future conduct of the union's affairs.'" *Hall v. Cole,* 412 U.S. 1, 8, 93 S.Ct. 1943, 1948, 36 L.Ed.2d 702 (1973). Most of the cases in which a plaintiff was awarded attorney's fees under the *Hall* common benefit theory have involved suits seeking redress for union action infringing upon a member's political rights. See, e. g., *Bunz v. Moving Picture Mach. Operators' Protective Union Local 224,* 186 U.S.App.D.C. 124, 567 F.2d 1117 (D.C.Cir. 1977); *Ross v. IBEW,* 544 F.2d 1022 (9th Cir. 1976); *McDonald v. Oliver,* 525 F.2d 1217 (5th Cir.), *cert. denied,* 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976).

█ In the present case, whether or not appellees' suit served as an antidote to autocracy, it did confer a benefit upon the general membership by insuring that other Union members charged with violations of the Union's rules would be accorded the procedural rights upheld by us. Such an enhancement of the integrity of the process of "law enforcement" increases the respect for that process and thereby fortifies the commitment to the rule of law, which is of capital importance in a responsible, democratic institution. We therefore hold that a plaintiff who vindicates procedural rights under § 101 may, in the discretion of the court, be entitled to recover attorney's fees and that the discretion was not abused in this case. See *Stein v. Mutuel Clerks' Guild of Massachusetts, Inc.,* 560 F.2d 486, 492 (1st Cir. 1977) (sustaining an award of attorney's fees in an action brought to set aside the results of a disciplinary proceeding tainted by defective procedure).

### (2) *Dolgen*

The jury's assessment of damages against Dolgen for wrongful discipline and denial of a full and fair hearing to appellees in violation of § 101 is contested on several grounds, including Dolgen's claims (1) that he was exempt from liability because, as manager of Local 10, he could not have played any official role in the disciplinary proceedings, (2) that the evidence of his domination of the proceedings was insufficient, and (3) that the verdict against him was inconsistent with the jury's finding that Local 10 did not prosecute appellees for an improper purpose. Although we conclude that the judgment against Dolgen for violation of § 101 must be reversed for other reasons, we find no merit in any of these grounds asserted by Dolgen.

█ As we pointed out in *Morrissey v. National Maritime Union,* 544 F.2d 19, 24 (1976), § 102 of the Landrum-Griffin Act does not limit liability to the Union. Nor, in the case of union officials, should liability be limited to their acts within the scope of their authority. The Act was designed "to curb the power of overweening union officials" generally, including abuse of their positions or inducement of other officials to do so. See, in accord, *Keene v. International Union of Operating Engineers, Local 624,* 569 F.2d 1375 (5th Cir. 1978) (union officer with influence but, apparently, no official power over operation of hiring hall liable for wrongful denial of job references to political opponent); *Robins v. Schonfeld,* 326 F.Supp. 525, 531 (S.D.N.Y.1971) (joint liability for attorney's fees); *Sands v. Abelli,* 290 F.Supp. 677, 685–86 (S.D.N.Y.1968) (joint liability for punitive damages and attorney's fees).[23] Although union action is a prerequisite to any liability under § 102, since the purpose of the Act is to regulate the relationship between a labor organization and its members, see *NLRB v. Allis-Chalmers Mfg. Co.,* 388 U.S. 175, 194, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967), a union official who aids abets, instigates, or directs a wrongful use of union power to deprive a member of his rights under § 101 may be

---

**23.** In *Robins* and *Sands,* the court assessed compensatory damages only against the union. See 326 F.Supp. at 532; 290 F.Supp. at 684.

held liable under § 102, which authorizes any person deprived of his § 101 rights to bring such "civil action . . . for such relief . . . as may be appropriate."

█ Although Dolgen is not immune from liability, we nevertheless reverse the judgment against him based on violation of appellees' § 101 rights because no evidence was submitted indicating injury attributed to Dolgen's alleged domination of the first two trials or to the imposition of a sanction allegedly at his behest. The evidence concerning damages on the federal claims consisted only of an undifferentiated reference to the entire course of the Union trials and appeals and to the hostility of all the Union officials involved in them. It therefore becomes unnecessary to resolve the possible inconsistency between the jury's verdict in favor of Local 10 on appellees' claim of retaliation and its award of damages on their claim against Dolgen.

## II. STATE LAW CLAIMS AGAINST DOLGEN

We turn next to Dolgen's challenge to the judgments in favor of Rosario and Vega on their state law claims against him of false arrest and malicious prosecution. Dolgen argues that the trial court lacked jurisdiction over these claims, that the claims were substantively invalid, and that there was insufficient evidence to sustain the damage awards. We disagree.

█ The test for determining whether a court having jurisdiction over a federal claim may properly assume jurisdiction over a pendent state claim is whether the claims derive from a common nucleus of operative fact. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725–27, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). This test is met in the present case. Although the federal claims arose primarily from the union disciplinary proceedings and the state claims from the confrontation in Dolgen's office on January 29,

1975, both were linked by the hostility of Union officials toward appellees' assertion of their § 101 rights. The January 29 events were unquestionably relevant to the LMRDA claims and Dolgen's conduct at the union trials bore on his motive and intent, an issue common to both claims. Cf. Fed.R. Evid. 404. With this common background the claims "are such that [appellees] would ordinarily be expected to try them all in one judicial proceeding." 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 18 (1966). Moreover, interests of judicial economy clearly weighed in favor of trying them together, in view of the duplication of witnesses testifying with respect to both claims. Nor was there any likelihood of confusion or that the state claims would predominate.

█ Although the joinder of the claims precluded Dolgen from impleading the City of New York as a defendant, there is no showing of a significant likelihood that he could have successfully transferred liability to it. For the same reason we uphold the district court's refusal to permit Dolgen to state a cross-claim against the City pursuant to F.R.Civ.P. 13(g) after appellees proposed to drop their direct claim against it, regardless of whether an independent basis existed for federal jurisdiction over it, see *Paris v. St. Johnsbury Trucking Co.*, 395 F.2d 543 (2d Cir. 1968); *Dery v. Wyer*, 265 F.2d 804 (2d Cir. 1959); *Fairview Park Excavating Co., Inc. v. Al Monzo Construction Co.*, 560 F.2d 1122 (3d Cir. 1977); 6 Wright & Miller, *Federal Practice and Procedure* §§ 1433, 1436; 3 Moore's Federal Practice ¶¶ 13.36, 14.26, since under F.R.Civ.P. 14 this matter lay within the district court's discretion, which was not abused.[24] See Advisory Committee Note to 1963 Amendment of Rule 14; *Laffey v. Northwest Airlines, Inc.*, 185 U.S. App.D.C. 322, 567 F.2d 429, 477 (1976), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978); 6 Wright & Miller, *su-*

---

**24.** Although Dolgen's claim against the City was, and technically remained a cross-claim, once appellees' claim against the City was dropped, the trial court's discretion to dismiss Dolgen's claim should be measured under Rule

14 since the effect of retaining the claim, like the effect of a true third-party claim, would have been to maintain the presence of a party who otherwise would not participate in the action.

*pra,* § 1443 at 208. Indeed, if the City had been joined as a cross-defendant it may well have disputed Dolgen's version of the arrest, which would have prejudiced him in defending against appellees' claims.

 Turning to the merits, Dolgen contends that the false arrest claim against him should have been dismissed as a matter of law for the reason that the police had probable cause to believe Rosario and Vega were committing in their presence criminal trespass in the third degree,[25] one of the offenses charged against appellees,[26] which would justify the arrest. *Broughton v. State,* 37 N.Y.2d 451, 458, 373 N.Y.S.2d 87, 95, 335 N.E.2d 310, 314, *cert. denied,* 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975). However, the record reveals a sharp dispute as to the underlying facts, requiring submission of the issue to the jury, *Smith v. County of Nassau,* 34 N.Y.2d 18, 24–25, 355 N.Y.S.2d 349, 354, 311 N.E.2d 489, 493–494 (1974), which appears to have rejected Dolgen's version. Moreover, even assuming *arguendo* that the police had probable cause to make an arrest, Dolgen would not necessarily be relieved of liability if he instigated the arrest and knew that there was no probable cause. See *Barnes v. Bollhorst,* 28 Misc.2d 866, 868, 215 N.Y.S.2d 348, 350 (Sup. Ct.Nassau Cty.), *aff'd,* 14 A.D.2d 774, 219 N.Y.S.2d 916 (2d Dept. 1961); *Stearns v. New York City Transit Authority,* 24 Misc.2d 216, 220, 200 N.Y.S.2d 272, 276 (Sup. Ct.N.Y.Cty.), *aff'd,* 12 A.D.2d 451, 209 N.Y. S.2d 264 (1st Dept. 1960); cf. *Schildhaus v. City of New York,* 7 Misc.2d 859, 863, 163 N.Y.S.2d 201, 205 (Sup.Ct.N.Y.Cty.1957), *rev'd as to another defendant,* 10 A.D.2d 566, 195 N.Y.S.2d 402 (1st Dept.), *rev'd,* 8 N.Y.2d 1108, 209 N.Y.S.2d 787, 171 N.E.2d 874 (1960); *Grago v. Vassello,* 173 Misc. 736, 739, 19 N.Y.S.2d 34, 37 (Sup.Ct.Madison Cty.1940) (distinction between merely mak-

ing statements that certain facts exist and leaving it to the authorities to decide whether to make an arrest and requesting or directing that someone be arrested). Obviously a person who knowingly gives false information to the police cannot then invoke the probable cause defense which might be available to the police acting upon the information given them. See *Trottier v. West,* 54 A.D.2d 1025, 388 N.Y.S.2d 180 (3d Dept. 1976); Prosser, *Law of Torts,* § 11 at 47 (1971).

 The defendant in an action for false arrest has the burden of proving legal justification as an affirmative defense. *Broughton, supra,* 37 N.Y.2d at 458, 373 N.Y.S.2d at 95, 335 N.E.2d at 315. The jury evidently did not believe Dolgen's version. Dolgen was therefore not entitled to a directed verdict on this count.

 For the same reasons we reject Dolgen's contention that appellees consented to arrest and that the trial judge erroneously instructed the jury to the contrary. "Consent" to a confinement means not mere acquiescence but a voluntary assent, as, for example, occurs when an individual is threatened with arrest and volunteers to accompany the police to the station in order to straighten matters out. See, e. g., *Foulke v. N. Y. Consolidated Ry. Co.,* 180 A.D. 848, 168 N.Y.S. 72 (2d Dept. 1917), *aff'd,* 228 N.Y. 269, 127 N.E. 237 (1920). Unless an individual tricks or goads the police into making an arrest, neither of which occurred here, his refusal to forego a right to remain where he is entitled to be does not constitute consent to a resulting unjustified arrest. See *Pierson v. Ray,* 386 U.S. 547, 558, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).

---

**25.** "A person is guilty of criminal trespass in the third degree when he knowingly enters or remains unlawfully in a building or upon real property which is fenced or otherwise enclosed in a manner designed to exclude intruders." N.Y.Penal L. § 140.10 (McKinney). Third degree criminal trespass is a class B misdemeanor, punishable by imprisonment for a period not to exceed three months, or a fine in an

amount not exceeding $500, or both. *Id.* §§ 70.15(2), 80.05(2).

**26.** Appellees were also charged with disorderly conduct, in violation of Penal L. § 240.20, and harassment, in violation of Penal L. § 250.20. These offenses are classified in New York law as "violations."

Dolgen's challenge to the judgment with respect to the malicious prosecution count raises a more difficult legal issue: whether appellees established that a criminal proceeding against them was commenced. Under New York law the commencement of a civil or criminal proceeding is a prerequisite to recovery on a theory of malicious prosecution. See *Broughton, supra*, 37 N.Y.2d at 457, 373 N.Y.S.2d at 93–94, 335 N.E.2d at 314. Appellees argue that a criminal proceeding began with the issuance of the Appearance Tickets at the police station. Dolgen responds that an action does not commence until process issues from a judicial officer, and that this does not occur upon issuance of an Appearance Ticket. To our knowledge no New York court has addressed the question. We believe, however, that the issue should be resolved in favor of appellees.

For criminal procedural law purposes the issuance of an Appearance Ticket does not strictly speaking commence a criminal action as that phrase is defined by § 100.05 of the Criminal Procedure Law, which states that "[a] criminal action is commenced by the filing of an accusatory instrument with a criminal court." An "accusatory instrument" is an information or a misdemeanor or felony complaint. *Id.* An Appearance Ticket does not "constitute an accusatory instrument for purposes of trial or plea." *People v. Jarmain*, 93 Misc.2d 950, 951, 403 N.Y.S.2d 886, 887 (Crim.Ct.N.Y.1978); *People v. Rodriguez*, 90 Misc.2d 356, 394 N.Y. S.2d 542 (Village Ct. of Rockville Centre 1977). No prosecution may proceed upon issuance of an Appearance Ticket unless the "police officer or other public servant who . . . issued and served [the Ticket] . . . ., at or before the time such appearance ticket is returnable, [has] file[d] or cause[d] to be filed with the local criminal court in which it is returnable an information, a simplified information or a misdemeanor complaint . . . ." N.Y.Crim. Pro.L. § 150.50(1). Relying upon a statement in *Broughton, supra*, that "some sort of prior judicial proceeding is the *sine qua*

*non* of a cause of action in malicious prosecution," 37 N.Y.2d at 457, 373 N.Y.S.2d at 93–94, 335 N.E.2d at 314 (citation omitted), Dolgen contends that no action commences for purposes of a tort claim of malicious prosecution until some independent official is presented with a formal accusation.

The definition of the commencement of a proceeding for purposes of the law of criminal procedure, however, does not necessarily coincide with the counterpart definition for purposes of the law of torts. *Weg v. Lippman*, 63 Misc.2d 352, 312 N.Y.S.2d 862 (Civ.Ct. of N.Y.1970). Moreover, in *Broughton*, where the question for decision was whether an indictment or arraignment creates a presumption of probable cause for arrest, rebuttable only by evidence of fraud or misrepresentation, the problems posed by the issuance of an Appearance Ticket were not before the court.

Prior to the advent in 1971 of the Appearance Ticket in non-traffic cases,[27] process obligating an individual to appear before a judicial officer to answer criminal charges could only be issued by a court or a magistrate. Hence, there was no occasion to decide whether issuance of non-judicial process commenced a criminal proceeding. If preservation of the integrity of judicial process were the sole concern of the law of malicious prosecution, we might adopt the position advocated by appellant Dolgen. But liability for the tort of malicious prosecution is also intended to protect an individual from the unwarranted defamation of character, inconvenience and anxiety suffered when he is compelled to appear in a court to answer anticipated criminal charges. In this regard the issuance of an Appearance Ticket may cause no less harm than issuance of a summons. Early New York cases recognized that an action for malicious prosecution enables an unjustly "prosecuted" individual to recover damages for the maligning of his character, see *Halberstadt v. New York Life Ins. Co.*, 194 N.Y. 1, 7, 86 N.E. 801 (1909), and for "the trouble and annoyance and expense of ap-

27. Act of May 20, 1970, 1970 N.Y.Laws 3117.

pearing and participating in the investigation of the charge." *Schneider v. Schlang*, 159 App.Div. 385, 389, 144 N.Y.S. 543, 546 (1st Dept. 1913).

■ A summons, of course, may be issued only upon the *filing* of an accusation. But aside from this—the difference between a summons and an Appearance Ticket is that the former is issued by the court and the latter by the police. Either may be issued upon an accusation sufficient on its face, without further inquiry by the issuing officer. See N.Y.Crim.Pro.L. §§ 120.20, 130.30, 150.20(2). As the statutory provision governing issuance of an Appearance Ticket following a warrantless arrest indicates, the Ticket is intended to enable the police and the accused to avoid the inconvenience of going before a magistrate upon a formal accusatory instrument. *Id.* § 150.-20(2). Like a summons, however, an Appearance Ticket is obligatory. Failure to appear as directed is a crime. N.Y.Penal L. § 215.58. In fact, the court in *Farkas v. New York*, 96 Misc.2d 784, 409 N.Y.S.2d 696 (Ct.Cl.1978), commented that in light of the criminal sanction for disobedience of an Appearance Ticket, a Ticket issued for an alleged commission of a misdemeanor "may be deemed a process." 96 Misc.2d at 787, n.3, 409 N.Y.S.2d at 698, n.3. The issuance of an Appearance Ticket is an official act; it is not merely the submission of an accusation by a private citizen. See Restatement (Second) of Torts, § 654, Comment d (1977).

The Appearance Ticket may have an impact on the accused just as severe as that of a summons. When either instrument is issued the accused bears the inconvenience and expense of appearing in court and, perhaps more important, is subject to the anxiety induced by a pending criminal charge. Moreover, if others learn that charges have been lodged against the accused, his character is no less traduced because the accusation is contained in an Appearance Ticket rather than in a summons.

■ For the foregoing reasons we believe that if a New York court faced the question before us it would rule that the issuance of an Appearance Ticket commenc-

es a prosecution for purposes of determining whether an action for malicious prosecution lies.

■ Dolgen argues that the judgments on the tort claims should be set aside because the trial court erroneously admitted into evidence under Fed.R.Evid. 803(6) a complaint report made out at the police station after appellees' arrest. Dolgen contends that this report did not qualify for admission under the business report exception to the hearsay rule because it lacked indicia of reliability, and that he was prejudiced by its admission because it suggested that Dolgen had told the police that appellees had entered his office without permission and that he intended to press charges.

According to Police Officer Acha, who was responsible for preparation of the report and signed it, a complaint report is filled out in the ordinary course of business whenever an arrest is made upon a citizen's complaint. The report is a one-page form requesting information regarding the names and addresses of the arrestees and of the complainant and a brief description of the incident resulting in the arrest. The form also contains a box to be checked if the complainant expresses an intent to prosecute.

The report prepared for appellees' arrest indicated that the complainant, Dolgen, intended to prosecute and stated:

> At above T/P/O [time and place of occurrence] [appellees] did enter office local 10 ILGW for a job at which time they were turned away. They created a scene and became very abusive. They then stormed into manager's office without permission or authority and refused to leave, and caused crowd to gather.

Officer Acha testified that since the report did not indicate that she witnessed the arrest, the information must have come from Dolgen. Acha acknowledged that the entries were not actually made by her but testified that she reviewed the entries before signing the report and would not have signed it unless she thought it was accurate. The entries were probably made by another

officer assisting the reporting officer by copying information from the arrest report which the latter prepared for each arrestee. According to Acha, this practice is not uncommon in a busy precinct house such as Midtown South.

Dolgen argues that the statements are hearsay, inadmissible under Rule 803(6) absent testimony by the preparer of the report that Dolgen made the statements attributed to him.[28] We disagree. Since the report was made in the regular course of the business activity of the Police Department and purported to be based on information from Dolgen, not from some bystander or third party, it was admissible under Rule 803(6). Its weight and the credibility to be extended to it were matters for the jury, which might be (and were) explored on cross-examination.

Thus there was proof entitling the jury to infer by a fair preponderance that Dolgen had maliciously used false information to cause the arrest and prosecution of Rosario and Vega, permitting an award to them of both general damages to compensate for injury to their reputation, mental anguish and emotional suffering, *Broughton, supra,* 37 N.Y.2d at 459–60, 373 N.Y.S.2d 96, 335 N.E.2d 315–16, as well as punitive damages, *Nardelli v. Stamberg,* 44 N.Y.2d 500, 406 N.Y.S.2d 443, 377 N.E.2d 975 (1978); *Sanders v. Rolnick,* 188 Misc. 627, 67 N.Y.S.2d 656 (1st Dept. 1947).

## CONCLUSION

The order and judgment of the district court setting aside the Union's discipline of appellees is affirmed to the extent that it prohibits the Union from (1) remanding disciplinary charges against a union member for retrial before essentially the same tribunal that has previously found them guilty or (2) denying an accused union member the right to record union disciplinary proceedings against him at his own expense where the Union does not provide a verbatim rec-

ord of the proceedings. The judgment is reversed to the extent that it prohibits the Union from imposing the disciplinary sanction, after a full and fair hearing, of suspension of the accused member's right to attend union meetings for a specified period of time.

The judgment of the district court is further reversed to the extent that it awards damages to appellees against Local 10 and Dolgen for violation of appellees' procedural and substantive rights under § 101 of the LMRDA. The provision to the effect that appellees' counsel may be awarded a reasonable attorney's fee for vindication of their rights under the LMRDA is affirmed.

The judgments in favor of appellees Rosario and Vega awarding compensatory and punitive damages against Abe Dolgen for false arrest and malicious prosecution are affirmed.

---

**28.** Acha testified that the report's description of the incident resulting in the arrest may not be a verbatim record of the complainant's account, but that the description would include all significant details mentioned by the complainant. Although Acha did testify in this case, she had no present recollection of the preparation of the report.