**The STATE OF NEW YORK, Appellee,**

v.

**SHORE REALTY CORP. and Donald LeoGrande, Appellants.**

**No. 606, Docket 84–7925.**

United States Court of Appeals, Second Circuit.

Argued Dec. 5, 1984.

Decided April 4, 1985.

David H. Peirez, Garden City, NY (Reisman, Peirez & Reisman, William R. Ginsberg, Charles A. Singer, Garden City, N.Y., of counsel), for appellants.

Gordon J. Johnson, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen. of the State of N.Y., Peter H. Schiff, Deputy Sol. Gen., James A. Sevinsky, Albany, N.Y., Stuart Miller, Nancy Stearns, Asst. Attys. Gen., New York City, of counsel), for appellee.

(F. Henry Habicht II, Asst. Atty. Gen., Washington, D.C., Raymond J. Dearie, U.S. Atty., for the E.D. of New York, Janice Siegel, Asst. U.S. Atty., Brooklyn, N.Y., Nancy B. Firestone, Diane Donley, Donald

T. Hornstein, Dept. of Justice, Washington, D.C., of counsel), for amicus curiae U.S.

Before FEINBERG, Chief Judge, OAKES and NEWMAN, Circuit Judges.

OAKES, Circuit Judge:

This case involves several novel questions about the scope of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601–9657 (1982) ("CERCLA"), and the interplay between that statute and New York public nuisance law. CERCLA—adopted in the waning hours of the Ninety-sixth Congress, and signed by President Carter on December 11, 1980—was intended to provide means for cleaning up hazardous waste sites and spills, and may generally be known to the public as authorizing the so-called Superfund, the $1.6 billion Hazardous Substances Response Trust Fund, 42 U.S.C. §§ 9631–9633.

On February 29, 1984, the State of New York brought suit against Shore Realty Corp. ("Shore") and Donald LeoGrande, its officer and stockholder, to clean up a hazardous waste disposal site at One Shore Road, Glenwood Landing, New York, which Shore had acquired for land development purposes. At the time of the acquisition, LeoGrande knew that hazardous waste was stored on the site and that cleanup would be expensive, though neither Shore nor LeoGrande had participated in the generation or transportation of the nearly 700,000 gallons of hazardous waste now on the premises. The State's suit under CERCLA for an injunction and damages was brought in the United States District Court for the Eastern District of New York, Henry Bramwell, Judge. The complaint also contained pendent state law nuisance claims, based on both common law and N.Y.Real Prop.Acts.Law § 841 (McKinney 1979). On October 15, 1984, the district court granted the State's motion for partial summary judgment. Apparently relying at least in part on CERCLA, it directed by permanent injunction that Shore and LeoGrande remove the hazardous waste stored on the property, subject to monitoring by the State, and held them liable for the State's "response costs," *see* 42 U.S.C. § 9607(a)(4)(A). In the alternative the court based the injunction on a finding that the Shore Road site was a public nuisance. Following a remand by this court on December 14, 1984, the district court on January 11, 1985, stated with more particularity the undisputed material facts underlying its decision finding defendants liable for the State's response costs and clarifying its earlier decision by basing the injunction solely on state public nuisance law. The court also modified its earlier decision by suggesting that CERCLA does not authorize injunctive relief in this case.[1]

We affirm, concluding that Shore is liable under CERCLA for the State's response costs. We hold that Shore properly was found to be a covered person under 42 U.S.C. § 9607(a); that the nonlisting by the Environmental Protection Agency ("EPA")[2] of the site on the National Priorities List ("NPL"), 42 U.S.C. § 9605(8)(B), is irrelevant to Shore's liability; that Shore cannot rely on any of CERCLA's affirmative defenses; but that, as suggested in the amicus brief filed for the United States and the district court's supplemental memorandum, injunctive relief under CERCLA is not available to the State. We nevertheless hold that the district court, exercising its pendent jurisdiction, properly granted the permanent injunction based on New York public nuisance law. Moreover, we hold LeoGrande jointly and severally liable under both CERCLA and New York law.

FACTS

Some of the most heated arguments on this appeal involve whether certain materi-

---

1. Because the State has sought to uphold the injunction under CERCLA, we do discuss the issue at pages 3093–95.

2. Although CERCLA expressly delegates authority to the President, *see, e.g.,* 42 U.S.C. § 9604(a), the President has transferred most of that authority to EPA, *see* Exec.Order No. 12,316, 46 Fed.Reg. 42,237 (1981); Exec.Order No. 12,286, 46 Fed.Reg. 9901 (1981). Hereinafter we use EPA to refer to any kind of executive authority under CERCLA.

al facts are undisputed. After careful scrutiny of the record and the district court's supplemental memorandum, we base our decision on the following facts.

LeoGrande incorporated Shore solely for the purpose of purchasing the Shore Road property. All corporate decisions and actions were made, directed, and controlled by him. By contract dated July 14, 1983, Shore agreed to purchase the 3.2 acre site, a small peninsula surrounded on three sides by the waters of Hempstead Harbor and Mott Cove, for condominium development. Five large tanks in a field in the center of the site hold most of some 700,-000 gallons of hazardous chemicals located there, though there are six smaller tanks both above and below ground containing hazardous waste, as well as some empty tanks, on the property. The tanks are connected by pipe to a tank truck loading rack and dockage facilities for loading by barge. Four roll-on/roll-off containers and one tank truck trailer hold additional waste. And before June 15, 1984, one of the two dilapidated masonry warehouses on the site contained over 400 drums of chemicals and contaminated solids, many of which were corroded and leaking.[3]

It is beyond dispute that the tanks and drums contain "hazardous substances" within the meaning of CERCLA. 42 U.S.C. § 9601(14). The substances involved—including benzene, dichlorobenzenes, ethyl benzene, tetrachloroethylene, trichloroethylene, 1,1,1-trichloroethene, chlordane, polychlorinated biphenyls (commonly known as PCBs), and bis (2-ethylhexyl) phthalate—are toxic, in some cases carcinogenic, and dangerous by way of contact, inhalation, or ingestion. These substances are present at the site in various combinations, some of which may cause the toxic effect to be synergistic.

The purchase agreement provided that it could be voided by Shore without penalty if after conducting an environmental study Shore had decided not to proceed. LeoGrande was fully aware that the tenants, Applied Environmental Services, Inc., and Hazardous Waste Disposal, Inc., were then operating—illegally, it may be noted—a hazardous waste storage facility on the site. Shore's environmental consultant, WTM Management Corporation ("WTM"), prepared a detailed report in July, 1983, incorporated in the record and relied on by the district court for its findings. The report concluded that over the past several decades "the facility ha[d] received little if any preventive maintenance, the tanks (above ground and below ground), pipeline, loading rack, fire extinguishing system, and warehouse have deteriorated." WTM found that there had been several spills of hazardous waste at the site, including at least one large spill in 1978. Though there had been some attempts at cleanup, the WTM testing revealed that hazardous substances, such as benzene, were still leaching into the groundwater and the waters of the bay immediately adjacent to the bulkhead abutting Hempstead Harbor.[4] After a site visit on July 18, 1983, WTM reported firsthand on the sorry state of the facility, observing, among other things, "seepage from the bulkhead," "corrosion" on all the

---

**3.** When these drums concededly were "bursting and leaking," Shore employees asked the State to enter the site, inspect it, and take steps to mitigate the "life-threatening crisis situation." Pursuant to stipulation and order entered on June 15, 1984, Shore began removing the drums. Some may still remain at the site.

**4.** Defendants now assert that there are triable issues of fact whether there was groundwater contamination, contamination in the harbor water near the bulkhead, or public toxicological risk associated with the chemicals in the soil or at the bulkhead. But Shore's own testing by WTM in August, 1984, shows significant concentrations of benzene, toluene, and xylene in the groundwater. And WTM's conclusion that there was no threat to drinking supplies was based on the observation that the groundwater flowed toward the harbor. Even assuming WTM's claim to be true, there was nevertheless groundwater contamination. Such a release poses a potential threat, it may be supposed, to local Long Island aquifers, a threat that defendants themselves brought to the attention of the bankruptcy court in seeking to evict the previous tenants. Moreover, defendants concede in their statement filed pursuant to Local Rule 3(g) that chemicals were leaching from the bulkhead into the harbor, at least in "trace quantities."

tanks, signs of possible leakage from some of the tanks, deterioration of the pipeline and loading rack, and fifty to one hundred fifty-five gallon drums containing contaminated earth in one of the warehouses. The report concluded that if the current tenants "close up the operation and leave the material at the site," the owners would be left with a "potential time bomb." WTM estimated that the cost of environmental cleanup and monitoring would range from $650,000 to over $1 million before development could begin. After receiving this report Shore sought a waiver from the State Department of Environmental Conservation ("DEC") of liability as landowners for the disposal of the hazardous waste stored at the site. Although the DEC denied the waiver, Shore took title on October 13, 1983, and obtained certain rights over against the tenants, whom it subsequently evicted on January 5, 1984.

Nevertheless, between October 13, 1983, and January 5, 1984, nearly 90,000 gallons of hazardous chemicals were added to the tanks. And during a state inspection on January 3, 1984, it became evident that the deteriorating and leaking drums of chemicals referred to above had also been brought onto the site. Needless to say, the tenants did not clean up the site before they left. Thus, conditions when Shore employees first entered the site were as bad as or worse than those described in the WTM report. As LeoGrande admitted by affidavit, "the various storage tanks, pipe lines and connections between these storage facilities were in a bad state of repair." While Shore claims to have made some improvements, such as sealing all the pipes and valves and continuing the cleanup of the damage from earlier spills, Shore did nothing about the hundreds of thousands of gallons of hazardous waste standing in deteriorating tanks. In addition, although a growing number of drums were leaking

hazardous substances, Shore essentially ignored the problem until June, 1984. *See supra* note 3.

On September 19, 1984, a DEC inspector observed one of the large tanks, which held over 300,000 gallons of hazardous materials, with rusting floor plates and tank walls, a pinhole leak, and a four-foot line of corrosion along one of the weld lines. On three other tanks, flakes of corroded metal "up to the size and thickness of a dime" were visible at the floorplate level.[5] While defendants now claim that the large tank was not leaking, their denial is untimely; they did not formally dispute the fact before the district court rendered its October 15, 1984, order. Moreover, defendants' claim that the pinhole has been patched hardly makes the existence of the pinhole leak a triable issue of fact. In addition, defendants do not contest that Shore employees lack the knowledge to maintain safely the quantity of hazardous chemicals on the site. And, because LeoGrande has no intention of operating a hazardous waste storage facility, Shore has not and will not apply for a permit to do so. Nor do defendants contest that the State incurred certain costs in assessing the conditions at the site and supervising the removal of the drums of hazardous waste.

### CERCLA

CERCLA's history reveals as much about the nature of the legislative process as about the nature of the legislation. In 1980, while the Senate considered one early version of CERCLA, the House considered and passed another. *See* H.R. 7020, 96th Cong., 2d Sess. (1980), *reprinted in 2 Legislative History of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (Superfund)* 391–463 (Comm.Print 1983) [hereinafter cit-

---

**5.** This testimony about leakage together with the unchallenged corrosion of several tanks certainly permitted the district court to disregard the conclusion of defendant's expert based primarily on 1980 ultrasonic tests that the tanks were safe. In addition, as noted above, WTM's report to defendants before purchase had point-

ed out, in July of 1983: "The tanks in the tank area on the hill demonstrated the greatest lack of maintenance. Upon inspection corrosion and lack of paint [were] obvious on both tanks that were in service and on those that were out of service."

ed as *CERCLA Legislative History*]; *see also* 126 Cong.Rec. 26,757–99 (1980) (debate and passage of H.R. 7020), *reprinted in 2 CERCLA Legislative History, supra,* at 294–389. The version passed by both Houses, however, was an eleventh hour compromise put together primarily by Senate leaders and sponsors of the earlier Senate version. Unfortunately, we are without the benefit of committee reports concerning this compromise. *But see infra* note 12. Nevertheless, the evolution of the legislation provides useful guidance to Congress's intentions. The compromise contains many provisions closely resembling those from earlier versions of the legislation, and the House and Senate sponsors sought to articulate the differences between the compromise and earlier versions. One of the sponsors claimed that the version passed "embodie[d] those features of the Senate and House bills where there has

been positive consensus" while "eliminat[ing] those provisions which were controversial." 126 Cong.Rec. 30,932 (statement of Sen. Randolph), *reprinted in 1 CERCLA Legislative History, supra,* at 685.

As explained in F. Anderson, D. Mandelker, & A. Tarlock, *Environmental Protection: Law and Policy* 568 (1984), CERCLA was designed "to bring order to the array of partly redundant, partly inadequate federal hazardous substances cleanup and compensation laws." [6] It applies "primarily to the cleanup of leaking inactive or abandoned sites and to emergency responses to spills." *Id.* And it distinguishes between two kinds of response: remedial actions—generally long-term or permanent containment or disposal programs [7]—and removal efforts—typically short-term cleanup arrangements.[8]

6. In defining the term "hazardous substance" in 42 U.S.C. § 9601(14), CERCLA incorporates by reference the substances designated as hazardous or toxic under the Clean Air Act, 42 U.S.C. § 7412, the Clean Water Act, 33 U.S.C. §§ 1317(a), 1321(b)(2)(A) (1982), the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. § 6921, the Toxic Substances Control Act, 15 U.S.C. § 2606 (1982), while authorizing EPA to designate additional substances that "may present substantial danger to the public health or welfare or the environment," 42 U.S.C. § 9602(a).

7. 42 U.S.C. § 9601(24) provides:
 "remedy" or "remedial action" means those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances or contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and

welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare. The term does not include offsite transport of hazardous substances, or the storage, treatment, destruction, or secure disposition offsite of such hazardous substances or contaminated materials unless the President determines that such actions (A) are more cost-effective than other remedial actions, (B) will create new capacity to manage, in compliance with subtitle C of the Solid Waste Disposal Act [42 U.S.C. 6291 *et seq.*], hazardous substances in addition to those located at the affected facility, or (C) are necessary to protect public health or welfare or the environment from a present or potential risk which may be created by further exposure to the continued presence of such substances or materials.

8. 42 U.S.C. § 9601(23) provides:
 "remove" or "removal" means the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the

CERCLA authorizes the federal government to respond in several ways. EPA can use Superfund resources to clean up hazardous waste sites and spills. 42 U.S.C. § 9611.[9] The National Contingency Plan ("NCP"), prepared by EPA pursuant to CERCLA, id. § 9605, governs cleanup efforts by "establish[ing] procedures and standards for responding to releases of hazardous substances." At the same time, EPA can sue for reimbursement of cleanup costs from any responsible parties it can locate, id. § 9607, allowing the federal government to respond immediately while later trying to shift financial responsibility to others. Thus, Superfund covers cleanup costs if the site has been abandoned, if the responsible parties elude detection, or if private resources are inadequate. See F. Anderson, D. Mandelker, & A. Tarlock, supra, at 573. In addition, CERCLA authorizes EPA to seek an injunction in federal district court to force a responsible party to clean up any site or spill that presents an imminent and substantial danger to public health or welfare or the environment. 42 U.S.C. § 9606(a). In sum, CERCLA is not a regulatory standard-setting statute such as the Clean Air Act. Id. §§ 7401–7642. Rather, the government generally undertakes pollution abatement, and polluters pay for such abatement through tax and reimbursement liability. See F. Anderson, D. Mandelker, & A. Tarlock, supra, at 569.[10]

Congress clearly did not intend, however, to leave clean up under CERCLA solely in the hands of the federal government. A state or political subdivision may enter into a contract or cooperative agreement with EPA, whereby both may take action on a cost-sharing basis. 42 U.S.C. § 9604(c), (d). And states, like EPA, can sue responsible parties for remedial and removal costs if such efforts are "not inconsistent with" the NCP. Id. § 9607(a)(4)(A). While CERCLA expressly does not preempt state law, id. § 9614(a), it precludes "recovering compensation for the same removal costs or damages or claims" under both CERCLA and state or other federal laws, id. § 9614(b), and prohibits states from requiring contributions to any fund "the purpose of which is to pay compensation for claims ... which may be compensated under" CERCLA, id. § 9614(c).[11] Moreover, "any ... person"

disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief Act of 1974 [42 U.S.C. 5121 et seq.].

9. CERCLA also establishes a Post-closure Liability Trust Fund, 42 U.S.C. § 9641, which assumes the liability of owners or operators of facilities that have received permits under RCRA, id. § 9607(k)(1).

10. The funds for Superfund come from taxes collected over a five-year period on petroleum products and certain inorganic chemicals, as well as from general federal revenues. See 42 U.S.C. § 9631.

11. New York State has established a mini-Superfund. Title 13 of the Environmental Conservation Law, N.Y.Envtl.Conserv.Law §§ 27–1301 to 27–1321 (McKinney 1984), represents the State's effort to fund and implement a program for cleaning up inactive hazardous waste disposal sites. Under Title 13, a state superfund management board administers the state fund, created by N.Y.State Fin.Law § 97–b (McKinney Supp. 1984), known as the hazardous waste remedial fund. The state fund, paid for by assessments on a hazardous waste generators pursuant to N.Y.Envtl.Conserv.Law § 27–0923, is available for cleanup and remedial programs pursuant to id. § 27–1313, but may not reimburse for costs covered by CERCLA, see Weinberg, Practice Commentary, following N.Y.Envtl.Conserv.Law § 27–1301. Moreover, state law expressly provides that no actions taken pursuant to it "shall duplicate federal actions for funding removal costs, damages or claims with respect to the release of hazardous substances within the state" and that "[n]o payments to the hazardous waste remedial fund ... shall be used for compensation of claims, costs of response or damage which may be funded under federal law." 1982 N.Y.Laws ch. 857, § 19. Thus it would appear that the New York law is not preempted by CERCLA.

The State has recently enacted two other statutes dealing with hazardous wastes. N.Y.Envtl.

who is acting consistently with the requirements of the NCP may recover "necessary costs of response." *Id.* § 9607(a)(4)(B); *see also City of Philadelphia v. Stepan Chemical Co.*, 544 F.Supp. 1135, 1142–43 (D.C.E. D.Pa.1982) (allowing a landowner to maintain a CERCLA action against a hazardous waste generator under section 9607(a)(4)(B)). Finally, responsible parties are liable for "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release." 42 U.S.C. § 9607(a)(4)(C).

▆▆▆ Congress intended that responsible parties be held strictly liable, even though an explicit provision for strict liability was not included in the compromise. Section 9601(32) provides that "liability" under CERCLA "shall be construed to be the standard of liability" under section 311 of the Clean Water Act, 33 U.S.C. § 1321, which courts have held to be strict liability, *see, e.g., Steuart Transportation Co. v. Allied Towing Corp.*, 596 F.2d 609, 613 (4th Cir.1979), and which Congress understood to impose such liability, *see* S.Rep. No. 848, 96th Cong., 2d Sess. 34 (1980) [hereinafter cited as Senate Report], *re-*

*printed in* 1 *CERCLA Legislative History, supra,* at 308, 341.[12] Moreover, the sponsors of the compromise expressly stated that section 9607 provides for strict liability.[13] *See* 126 Cong.Rec. 30,932 (statement of Sen. Randolph), *reprinted in* 1 *CERCLA Legislative History, supra,* at 685; *id.* at 31,964 (statement of Rep. Florio), *reprinted in* 1 *CERCLA Legislative History, supra,* at 777; *see also id.* at 31,966 (Department of Justice view of Senate compromise discussing strict liability), *reprinted in* 1 *CERCLA Legislative History, supra,* at 780–81. Strict liability under CERCLA, however, is not absolute; there are defenses for causation solely by an act of God, an act of war, or acts or omissions of a third party other than an employee or agent of the defendant or one whose act or omission occurs in connection with a contractual relationship with the defendant. 42 U.S.C. § 9607(b).

## DISCUSSION

### A. Liability for Response Costs Under CERCLA

▆▆▆ We hold that the district court properly awarded the State response costs under section 9607(a)(4)(A).[14] The State's

---

Conserv.Law §§ 27–0900 to 27–0923 regulates the management of hazardous waste from its generation, storage, transportation, and treatment, to its disposal through a system of permits and manifests, consonant with RCRA, 42 U.S.C. §§ 6901–6987. And N.Y.Envtl.Conserv.Law §§ 27–1101 to 27–1107 governs the siting of future industrial waste facilities.

**12.** While the Senate Report concerns a pre-compromise version of the legislation, we nevertheless find it a useful guide to congressional intent, particularly about those matters receiving little or no change as part of the compromise.

**13.** Both the earlier House and Senate versions contained language providing for strict, joint and several liability. *See* S.1480, 96th Cong., 2d Sess. § 4(a), 126 Cong.Rec. 30,908, *reprinted in* 1 *CERCLA Legislative History, supra,* at 486; H.R. 7020, 96th Cong., 2d Sess. § 3071(a)(1)(D), 126 Cong.Rec. 26,779, *reprinted in* 2 *CERCLA Legislative History, supra,* at 438–39. As part of the compromise, the sponsors removed this language, inserted the reference to liability under the Clean Water Act and indicated that the joint

and several liability question should be addressed by the courts and interpreted in light of the common law. *See* 126 Cong.Rec. 30,932 (statement of Sen. Randolph), *reprinted in* 1 *CERCLA Legislative History, supra,* at 685. Moreover, while we need not address the question, commentators have noted that joint and several liability is consistent with the contribution language of 42 U.S.C. § 9607(e)(2). *See* F. Anderson, D. Mandelker, & A. Tarlock, *supra,* at 576.

**14.** We pause to note that, while the district court order granting the State response costs under CERCLA is neither a final order nor an appealable interlocutory order, it is appropriate to review the order based on pendent appellate jurisdiction. The response cost issues surely "are related to the primary appealable" injunction issues, *Sweater Bee by Banff, Ltd. v. Manhattan Industries, Inc.*, 754 F.2d 457, 466 (2d Cir.1985), and "review of the appealable order will involve consideration of factors relevant to the otherwise nonappealable order," *General Motors Corp. v. City of New York*, 501 F.2d 639, 648 (2d Cir.1974).

costs in assessing the conditions of the site and supervising the removal of the drums of hazardous waste squarely fall within CERCLA's definition of response costs, even though the State is not undertaking to do the removal. *See id.* §§ 9601(23), (24), (25). Contrary to Shore's claims, the State's motion for summary judgment sought such costs, and Shore had ample opportunity for discovery. That a detailed accounting was submitted only at this court's request for supplemental findings is immaterial; Shore had an opportunity to contest the accounting but failed to make anything more than a perfunctory objection.

1. *Covered Persons.* CERCLA holds liable four classes of persons:

(1) the owner and operator of a vessel (otherwise subject to the jurisdiction of the United States) or a facility,[15]

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and

containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities or sites selected by such person.

42 U.S.C. § 9607(a). As noted above, section 9607 makes these persons liable, if "there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance" from the facility,[16] for, among other things, "all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan."

 Shore argues that it is not covered by section 9607(a)(1) because it neither owned the site at the time of disposal nor caused the presence or the release of the hazardous waste at the facility. While section 9607(a)(1) appears to cover Shore, Shore attempts to infuse ambiguity into the statutory scheme, claiming that section 9607(a)(1) could not have been intended to include all owners, because the word "owned" in section 9607(a)(2) would be unnecessary since an owner "at the time of disposal" would necessarily be included in section 9607(a)(1). Shore claims that Congress intended that the scope of section 9607(a)(1) be no greater than that of section 9607(a)(2) and that both should be limited by the "at the time of disposal" language.

---

In light of our analysis, we do not address the State's argument that its costs are recoverable as "damages for injury to . . . natural resources," under 42 U.S.C. § 9607(a)(4)(C).

In addition, while the State does not make the argument, we note that New York law appears to provide the State with restitution costs in a public nuisance action. *See State v. Schenectady Chemicals Co.,* 103 A.D.2d 33, 37, 479 N.Y. S.2d 1010, 1014 (1984). This remedy may closely resemble response cost liability under CERCLA.

15. CERCLA defines the term "facility" broadly to include any property at which hazardous substances have come to be located. *See* 42 U.S.C. § 9601(9).

16. The phrase "from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance" is incorporated in and seems to flow as

if it were a part only of subparagraph (4), but it is quite apparent that it also modifies subparagraphs (1)–(3) inclusive. When the Senate's compromise bill was printed in the Congressional Record at the start of the debate, 126 Cong. Rec. 30,916–30, the predecessor of § 9607, *id.* at 30,921, followed the printing format of the Senate version as reported at *id.* at 30,908; *see also* 1 *CERCLA Legislative History, supra,* at 486; in each case subparagraph (4) ended with the words "selected by such person," and the commencing clause "from which there is a release" was printed as a new line, supporting the reading we give it above. The latter clause evidently slipped into subparagraph (4), as sometimes happens in the waning days of a session, when the entire Senate compromise was reprinted prior to the final vote. 126 Cong.Rec. 30,961; *see also* 1 *CERCLA Legislative History, supra,* at 602–03. The change thus appears to have been simply a printer's error.

By extension, Shore argues that both provisions should be interpreted as requiring a showing of causation. We agree with the State, however, that section 9607(a)(1) unequivocally imposes strict liability on the current owner of a facility from which there is a release or threat of release, without regard to causation.[17]

Shore's claims of ambiguity are illusory; section 9607(a)'s structure is clear. Congress intended to cover different classes of persons differently. Section 9607(a)(1) applies to all current owners and operators, while section 9607(a)(2) primarily covers prior owners and operators. Moreover, section 9607(a)(2)'s scope is more limited than that of section 9607(a)(1). Prior owners and operators are liable only if they owned or operated the facility "at the time of disposal of any hazardous substance"; this limitation does not apply to current owners, like Shore. Thus, Shore's reliance on the holding of the district court in *Cadillac Fairview/California, Inc. v. Dow Chemical Co.*, 14 Envtl.L.Rep. (Envtl.L. Inst.) 20,376 (C.D.Cal. Mar. 5, 1984), is inappropriate The *Cadillac Fairview* court was concerned with a prior owner and predicated its holding solely upon the words of section 9607(a)(2). *Id.* at 20,378.

Shore's causation argument is also at odds with the structure of the statute. Interpreting section 9607(a)(1) as including a causation requirement makes superfluous the affirmative defenses provided in section 9607(b), each of which carves out from liability an exception based on causation. Without a clear congressional command otherwise, we will not construe a statute in any way that makes some of its provisions surplusage. *See, e.g., United States v. Mehrmanesh*, 689 F.2d 822, 829 (9th Cir.1982); *National Insulation Transportation Committee v. ICC*, 683 F.2d 533, 537 (D.C.Cir.1982).[18] Moreover, Shore again improperly relies on *Cadillac Fairview*. There, the court did not interpret section 9607(a) to require causation, as defendants claim, but simply ownership "at the time of disposal." 14 Envtl.L.Rep. (Envtl.L.Inst.) at 20,378. Several other district courts explicitly have declined to read a causation requirement into section 9607(a). *See, e.g., United States v. Cauffman*, No. CV 83–6318–KN(Bx), slip op. at 2–3 (C.D.Cal. Oct. 23, 1984) (citing other cases).

Our interpretation draws further support from the legislative history. Congress specifically rejected including a causation requirement in section 9607(a). The early House version imposed liability only upon "any person who caused or contributed to the release or threatened release." H.R. 7020, 96th Cong., 2d Sess. § 3071(a), 126 Cong.Rec. 26,779, *reprinted in* 2 *CERCLA Legislative History, supra,* at 438. The compromise version, to which the House later agreed, *see* 126 Cong.Rec. 31,981–82, *reprinted in* 1 *CERCLA Legislative History, supra,* at 821–24, imposed liability on classes of persons without reference to whether they caused or contributed to the release or threat of release. *See also* S.1480, 96th Cong., 2d Sess. § 4(a), 126 Cong.Rec. 30,900 (Senate version of legislation changed from imposing liability on an "owner or operator" and "any other person who caused or contributed . . . to such discharge, release, or disposal" to imposing

---

17. We pause to note the distinction between whether § 9607(a) imposes strict liability and whether it requires a showing of causation. That is to say, finding that § 9607(a) imposes strict liability does not rebut Shore's causation argument. Traditional tort law has often imposed strict liability while recognizing a causation defense. *See* W. Prosser, *Handbook of the Law of Torts* § 79, at 517 (1971); *see also supra* note 13 and accompanying text (discussing strict liability).

18. The phrase "from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance" also limits the scope of § 9607(a)(1). *See supra* note 16. It is, however, clumsy grammatically, and ambiguous since the absence of a comma after the words "threatened release" and the use of the words "which causes," as opposed to "that causes," leave it uncertain whether there is liability from a release without the incurrence of "response costs." Since response costs were incurred here, the ambiguity is academic for our purposes.

liability on four classes of persons, the scheme adopted in the compromise version), *reprinted in* 1 *CERCLA Legislative History, supra,* at 485–86. Thus, the remarks of Representatives Stockman and Gore describing the House version containing the causation language, *see* 126 Cong. Rec. 26,786–87, *reprinted in* 2 *CERCLA Legislative History, supra,* at 359–61, on which Shore relies, are inapposite.[19]

Furthermore, as the State points out, accepting Shore's arguments would open a huge loophole in CERCLA's coverage. It is quite clear that if the current owner of a site could avoid liability merely by having purchased the site after chemical dumping had ceased, waste sites certainly would be sold, following the cessation of dumping, to new owners who could avoid the liability otherwise required by CERCLA. Congress had well in mind that persons who dump or store hazardous waste sometimes cannot be located or may be deceased or judgment-proof. *See, e.g.,* Senate Report, *supra,* at 16, *reprinted in* 1 *CERCLA Legislative History, supra,* at 323. We will not interpret section 9607(a) in any way that apparently frustrates the statute's goals, in the absence of a specific congressional intention otherwise. *See Capitano v. Secretary of Health and Human Services,* 732 F.2d 1066, 1076 (2d Cir.1984); *Bartok v. Boosey & Hawkes, Inc.,* 523 F.2d 941, 947 (2d Cir. 1975).

Finally, we need not address whether Shore is also subject to liability under section 9607(a)(2) because some 90,000 gallons of waste were disposed of, apparently by unauthorized tenants, after Shore took title on October 13, 1983. Nor need we decide whether hazardous substances have been "disposed of" after Shore employees entered the property in January, 1984.

■ 2. *Release or Threat of Release.* We reject Shore's repeated claims that it has put in dispute whether there has been a release or threat of release at the Shore Road site. The State has established that it was responding to "a release, or a threatened release" when it incurred its response costs. We hold that the leaking tanks and pipelines, the continuing leaching and seepage from the earlier spills, and the leaking drums all constitute "releases." 42 U.S.C. § 9601(22). Moreover, the corroding and deteriorating tanks, Shore's lack of expertise in handling hazardous waste, and even the failure to license the facility, amount to a threat of release.

■ In addition, Shore's suggestion that CERCLA does not impose liability for threatened releases is simply frivolous. Section 9607(a)(4)(A) imposes liability for "all costs of removal or remedial action." The definitions of "removal" and "remedial" explicitly refer to actions "taken in the event of the threat of release of hazardous substances." *See supra* notes 7, 8; *see also,* Senate Report, *supra,* at 54, *reprinted in* 1 *CERCLA Legislative History, supra,* at 361.

■ 3. *The NPL and Consistency with the NCP.* Shore also argues that, because the Shore Road site is not on the NPL, the State's action is inconsistent with the NCP and thus Shore cannot be found liable under section 9607(a). This argument is not frivolous. Section 9607(a)(4)(A) states that polluters are liable for response costs "not inconsistent with the national contingency plan." And section 9605, which directs EPA to outline the NCP, includes a provision that requires EPA to publish the NPL. Nevertheless, we hold

---

**19.** Indeed, an opponent of the bill, Representative Broyhill, argued that one of the defects of the bill was that the owner of a facility could be held "strictly liable ... entirely on the basis of having been found to be an owner .... There is no language requiring any causal conviction [*sic:* connection] with a release of a hazardous substance." 126 Cong.Rec. 31,969 (1980), *reprinted in* 1 *CERCLA Legislative History, supra,* at 786. There is, to be sure, a contrary state-

ment from Senator Helms: "The Government can sue a defendant under the bill only for those costs and damages that it can prove were caused by the defendant's conduct." *Id.* at 30,-972, *reprinted in* 1 *CERCLA Legislative History, supra,* at 760. Senator Helms, who opposed the legislation, appears to have been fighting a rearguard action by that remark, or, more likely, he may have been referring to the causation defenses in § 9607(b).

that inclusion on the NPL is not a requirement for the State to recover its response costs.[20]

The State claims that, while NPL listing may be a requirement for the use of Superfund money, it is not a requisite to liability under section 9607. *See New York v. General Electric Co.,* 592 F.Supp. 291, 303–04 (N.D.N.Y.1984). The State relies on the reasoning of several district courts that have held that liability under section 9607 is independent of the scope of section 9611, which governs the expenditure of Superfund monies, and by extension, section 9604, which governs federal cleanup efforts. *See, e.g., id.; United States v. Northeastern Pharmaceutical & Chemical Co.,* 579 F.Supp. 823, 850–51 (W.D.Mo. 1984) *("NEPACCO"); United States v. Wade,* 577 F.Supp. 1326, 1334–36 (E.D.Pa. 1983). These courts have reasoned that CERCLA authorizes a bifurcated approach to the problem of hazardous waste cleanup, by distinguishing between the scope of direct federal action with Superfund resources and the liability of polluters under section 9607. While implicitly accepting that Superfund monies can be spent only on sites included on the NPL, they conclude that this limitation does not apply to section 9607. And it is true that the relevant limitation on Superfund spending is that it be "consistent with" the NCP, 42 U.S.C. § 9604(a), while under section 9607(a)(4)(A), liability is limited to response costs "not inconsistent with" the NCP. This analysis, however, is not so compelling as might be; the distinction between section 9604 and section 9607 blurs for two reasons. First, as we noted above, Congress envisioned section 9607 as a means of reimbursement of monies spent by government on cleanup pursuant to section 9604. The money that the federal government presumably would be spending is Superfund money. That is

to say, Congress may have seen section 9607 as equal in scope to sections 9604 and 9611. Second, it is difficult to accept the State's argument that section 9607's statement "[n]otwithstanding any other provision or rule of law" supports the distinction. Shore's argument is not based on implying limitations on the scope of section 9604 into section 9607 but on an interpretation of "not inconsistent with" the NCP under section 9607 itself.

■ Still, we reject Shore's argument. Instead of distinguishing between the scope of section 9607 and the scope of section 9604, we hold that NPL listing is not a general requirement under the NCP. We see the NPL as a limitation on remedial, or long-term, actions—as opposed to removal, or short-term, actions—particularly federally funded remedial actions. The provisions requiring the establishment of NPL criteria and listing appear to limit their own application to remedial actions. Section 9605(8)(A) requires EPA to include in the NCP "criteria for determining priorities among releases or threatened releases ... for the purpose of taking remedial action and, to the extent practicable taking into account the potential urgency of such action, for the purpose of taking removal action." And section 9605(8)(B), which requires EPA to draw up the NPL, refers to "priorities for remedial action." *Accord* 126 Cong.Rec. 30,933 (statement of Sen. Randolph), *reprinted in* 1 *CERCLA Legislative History, supra,* at 689; 40 C.F.R. § 300.68(a) (1984). And section 9604, which authorizes and governs federal response actions, reveals the special role of the NPL for federally sponsored remedial actions. Section 9604(c)(3) states that federal remedial actions can be taken only if "the State in which the release occurs first enters into a contract or cooperative agree-

---

**20.** Shore also argues that the NPL's exclusion of the Shore Road site deprived the district court of "subject matter jurisdiction" under § 9607. As a consequence, according to Shore, the federal issues disappear as does the basis for addressing the pendent public nuisance issues, under *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), and progeny.

In light of our holding, we do not address whether § 9607 states jurisdictional requirements, *cf.* 42 U.S.C. § 9613(b) (providing for exclusive jurisdiction over all controversies arising out of this chapter in the district courts), or whether pendent jurisdiction would lie even if inclusion on the NPL were a requirement for recovery under § 9607(a).

ment" with the federal government, thus setting up a joint federal-state cost-sharing and cleanup effort. At the same time, section 9604(d)(1) states that such joint efforts must be taken "in accordance with criteria and priorities established pursuant to section 9605(8)"—the NPL provision. If the NPL criteria and listing were a general requirement for action "consistent with" the NCP, this language would be surplusage. *See supra* text accompanying note 18.

CERCLA's legislative history also supports our conclusion. Congress did not intend listing on the NPL to be a requisite to all response actions. Neither the earlier House nor Senate version included the NPL in the NCP, *see* S.1480, 96th Cong., 2d Sess. §§ 3(c)(5), 6(a)(2)(B), 126 Cong.Rec. 30,908, 30,913, *reprinted in* 1 *CERCLA Legislative History, supra,* at 482–84, 529–30; H.R.7020, 96th Cong., 2d Sess. §§ 3032(b), 3042, 126 Cong.Rec. 26,775, 26,-777, *reprinted in* 2 *CERCLA Legislative History, supra,* at 404, 420–23, although the Senate version limited joint federal-state responses to sites on the NPL, *see* S.1480, 96th Cong., 2d Sess. § 6(a)(2)(B), 126 Cong.Rec. 30,913, *reprinted in* 1 *CERCLA Legislative History, supra,* at 529–30; *see also* Senate Report, *supra,* at 60 ("To receive reimbursement from the Fund, [joint federal-state] response actions may be undertaken only at facilities or sites which are in accordance with the national priority list. . . ."), *reprinted in* 1 *CERCLA Legislative History, supra,* at 367. It is also instructive to note that the Senate Report described the NPL as serving "primarily informational purposes, identifying for the States and the public those facilities and sites or other releases which appear to warrant *remedial actions*." *Id.* (emphasis added). In reviewing the changes made by the compromise, no· one mentioned that NPL listing would be a requirement for removal action or even a general requirement under the NCP.

Moreover, limiting the scope of NPL listing as a requirement for response action is consistent with the purpose of CERCLA. The NPL is a relatively short list when compared with the huge number of hazardous waste facilities Congress sought to clean up. *See* 126 Cong.Rec. 30,931 (statement of Sen. Randolph), *reprinted in* 1 *CERCLA Legislative History, supra,* at 683–84; *id.* at 31,964 (statement of Rep. Florio), *reprinted in* 1 *CERCLA Legislative History, supra,* at 776. And it makes sense for the federal government to limit only those long-term—remedial—efforts that are federally funded. We hold that Congress intended that, while federally funded remedial efforts be focused solely on those sites on the NPL, states have more flexibility when acting on their own. *See Pinole Point Properties, Inc. v. Bethlehem Steel Corp.,* 596 F.Supp. 283, 290 (N.D.Cal.1984).

Finally, we reject Shore's argument that the State's response costs are not recoverable because the State has failed to comply with the NCP by not obtaining EPA authorization, nor making a firm commitment to provide further funding for remedial implementation nor submitting an estimate of costs. *See* 40 C.F.R. § 300.62 (1984) (describing the states' role in joint federal-state response actions). EPA designed the regulatory scheme—the NCP—focusing on federal and joint federal-state efforts. *See, e.g., id.* § 300.6 (defining "lead agency"). Shore apparently is arguing that EPA has ruled that the State cannot act on its own and seek liability under CERCLA. We disagree. Congress envisioned states' using their own resources for cleanup and recovering those costs from polluters under section 9607(a)(4)(A). We read section 9607(a)(4)(A)'s requirement of consistency with the NCP to mean that states cannot recover costs inconsistent with the response methods

---

**21.** Shore does not argue that the State's costs are "inconsistent with" the cost-effective response methods outlined in the NCP. In any event, it appears that the State's costs in fact are consistent with those response methods. *See* 40 C.F.R. § 300.65(b) (immediate removal actions);

outlined in the NCP.[21] *Cf.* 126 Cong.Rec. 30,933 (statement of Sen. Randolph) (suggesting that the primary purpose of the NCP was "guidance on cost-effectiveness"), *reprinted in* 1 *CERCLA Legislative History, supra,* at 689. Moreover, the NCP itself recognizes a role for states in compelling "potentially responsible parties" to undertake response actions independent of EPA and without seeking reimbursement from Superfund. 40 C.F.R. § 300.24(c);[22] *accord* 47 Fed.Reg. 31,195 (1982). Thus, the NCP's requirements concerning collaboration in a joint federal-state cleanup effort are inapplicable where the State is acting on its own. *Cf. Pinole Point,* 596 F.Supp. at 289–90 (holding that supervision by EPA is not a requisite for an action under section 9607(a)(4)(B)). *But cf. Artesian Water Co. v. New Castle County,* No. 83–854–WKS, slip op. at 19–30 (D.Del. Feb. 14, 1985) (distinguishing between remedial and removal costs and holding that the NCP validly requires governmental approval of remedial actions by private parties seeking recovery under section 9607(a)(4)(B)); *Wickland Oil Terminals v. Asarco, Inc.,* 590 F.Supp. 72, 77–78 (N.D.Cal.1984) (holding that response costs by private party under section 9607(a)(4)(B) cannot be recovered absent supervision by EPA or by a state agency that has entered into a cooperative agreement under section 9604(d), pursuant to the NCP as promulgated by EPA, without distinguishing between remedial and removal actions); *Bulk Distribution Centers, Inc. v. Monsanto Co.,* 589 F.Supp. 1437, 1446–48 (S.D.Fla.1984) (same). Indeed, the kind of action taken here is precisely that envisioned by the regulations. *See supra* note 22.

**4. *Affirmative defense.*** Shore also claims that it can assert an affirmative defense under CERCLA, which provides a limited exception to liability for a release or threat of release caused solely by

> an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions.

42 U.S.C. § 9607(b)(3). We disagree. Shore argues that it had nothing to do with the transportation of the hazardous substances and that it has exercised due care since taking control of the site. Who the "third part(ies)" Shore claims were responsible is difficult to fathom. It is doubtful that a prior owner could be such, especially the prior owner here, since the acts or omissions referred to in the statute are doubtless those occurring during the ownership or operation of the defendant.[23] Similarly, many of the acts and omissions of the prior tenants/operators fall outside the scope of section 9607(b)(3), because they occurred before Shore owned the

---

*id.* § 300.66(c) (inspections and testing for removal actions); *id.* § 300.68(f) (sampling and monitoring for remedial actions); *id.* § 300.71 (worker protection and compliance with "[safety] requirements deemed necessary by the lead agency").

**22.** Section 300.24(c) provides: "States are encouraged to use State authorities to compel potentially responsible parties to undertake response actions, or to themselves undertake re-

sponse actions which are not eligible for Federal funding."

**23.** While we need not reach the issue, Shore appears to have a contractual relationship with the previous owners that also blocks the defense. The purchase agreement includes a provision by which Shore assumed at least some of the environmental liability of the previous owners.

property. In addition, we find that Shore cannot rely on the affirmative defense even with respect to the tenants' conduct during the period after Shore closed on the property and when Shore evicted the tenants. Shore was aware of the nature of the tenants' activities before the closing and could readily have foreseen that they would continue to dump hazardous waste at the site. In light of this knowledge, we cannot say that the releases and threats of release resulting of these activities were "caused solely" by the tenants or that Shore "took precautions against" these "foreseeable acts or omissions."

### B. *Injunctive Relief Under CERCLA*

▇▇▇ Having held Shore liable under CERCLA for the State's response costs, we nevertheless are required to hold that injunctive relief under CERCLA is not available to the State. *See supra* note 1. Essentially, the State urges us to interpret the right of action under section 9607 broadly, claiming that "limiting district court relief [under section 9607] to reimbursement could have a drastic effect upon the implementation of Congress's desire that waste sites be cleaned." Conceding that section 9607 does not explicitly provide for injunctive relief, the State suggests that the court has the inherent power to grant such equitable relief, citing *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944).

The statutory scheme, however, shows that Congress did not intend to authorize such relief. Section 9606 expressly authorizes EPA to seek injunctive relief to abate "an actual or threatened release of a hazardous substance from a facility." Implying the authority to seek injunctions under section 9607 would make the express injunctive authority granted in section 9606 surplusage. *See supra* text accompanying note 18; *see also Minnesota v. Northern Securities Co.,* 194 U.S. 48, 71, 24 S.Ct. 598, 604, 48 L.Ed. 870 (1904) (denying private persons a right to injunctive relief under the Sherman Act because it expressly authorized only the federal government to seek relief); *cf. Paine Lumber Co. v.*

*Neal,* 244 U.S. 459, 471, 37 S.Ct. 718, 719, 61 L.Ed. 1256 (1917) (holding that section 4 of the Clayton Act provides a right of action for damages but not injunctions); *Sedima, S.P.R.L. v. Imrex Co.,* 741 F.2d 482, 489 n. 20 (2d Cir.1984) (stating that no private right to an injunction may be implied from the government's right), *cert. granted,* — U.S. —, 105 S.Ct. 901, 83 L.Ed.2d 917 (1985). In addition, the scope of injunctive relief under section 9607 would conflict with the express scope of section 9606. The standard for seeking abatement under section 9606 is more narrow than the standard of liability under section 9607. Section 9606 authorizes injunctive relief only where EPA "determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment." Section 9607 contains no such limitation. Finally, we recognize that "it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19, 100 S.Ct. 242, 247, 62 L.Ed.2d 146 (1979).

If there were any doubt about the statutory language, the legislative history would compel us to reject the State's argument. Congress specifically declined to provide states with a right to injunctive relief. The early Senate version empowered either EPA "or the State" to seek injunctive relief, *see* S.1480, 96th Cong., 2d Sess. § 3(d), 126 Cong.Rec. 30,908, *reprinted in* 1 *CERCLA Legislative History, supra,* at 484–85, yet the compromise limited that power to EPA alone, *see* 42 U.S.C. § 9606(a). Moreover, the House version, which authorized EPA to order cleanup, *see* H.R.7020, 96th Cong., 2d Sess. § 3041(a), 126 Cong.Rec. 26,775–76, *reprinted in* 2 *CERCLA Legislative History, supra,* at 406–12—rather than to seek an injunction in federal court—did not give states that authority, even though the National Association of Attorneys General urged Congress to extend the same powers to the states as

it gave to the federal government. *See* 126 Cong.Rec. 26,761–62, *reprinted in* 2 *CERCLA Legislative History, supra,* at 307.

### C. *Common Law of Public Nuisance*

As a preliminary matter, we cannot accept Shore's suggestion that the district court's reliance on New York public nuisance law as an alternative basis for the injunction rested on an improper exercise of pendent jurisdiction. The district court had the power to hear the state law claims. The public nuisance claim for abatement and the CERCLA claims clearly "derive from a common nucleus of operative fact" and the State "would ordinarily be expected to try them all in one judicial proceeding." *Gibbs,* 383 U.S. at 725, 86 S.Ct. at 1138; *accord Rosario v. Amalgamated Ladies' Garment Cutters' Union, Local 10,* 605 F.2d 1228, 1247 (2d Cir.1979), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1853, 64 L.Ed.2d 273 (1980). And we cannot say that the district court abused its discretion in reaching the public nuisance claim. The state law issues do not predominate—particularly if the State's argument that CERCLA grants injunctive relief is seen as we see it to be colorable [24]—there is no likelihood of confusion; and "interests of judicial economy clearly weighed in favor of trying them together." *Id. See generally* 13B C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 3567.1 (1984). Moreover, it is irrelevant that the scope of relief under state law differs from that under federal law. *See Gibbs,* 383 U.S. at 728, 86 S.Ct. at 1140; *Rosario,* 605 F.2d at 1251.

In challenging the decision below, Shore fails to distinguish between a public nuisance and a private nuisance. The former "is an offense against the State and is subject to abatement or prosecution on application of the proper governmental agency" and "consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all ... in a manner such as to ... endanger or injure the property, health, safety or comfort of a considerable number of persons." *Copart Industries, Inc. v. Consolidated Edison Co.,* 41 N.Y.2d 564, 568, 362 N.E.2d 968, 971, 394 N.Y.S.2d 169, 172 (1977) (citations omitted); *see also State v. Schenectady Chemicals, Inc.,* 117 Misc.2d 960, 965–67, 459 N.Y.S.2d 971, 976–77 (Sup.Ct.1983) (upholding State cause of action to compel cleanup of a chemical waste site under public nuisance law), *modified,* 103 A.D.2d 33, 479 N.Y.S.2d 1010 (1984). The latter, however, "threatens one person or a relatively few ..., an essential feature being an interference with the use or enjoyment of land .... It is actionable by the individual person or persons whose rights have been disturbed." *Copart Industries,* 41 N.Y.2d at 568, 362 N.E.2d at 971, 394 N.Y.S.2d at 172. Public and private nuisance bear little relationship to each other. Although some rules apply to both, other rules apply to one but not the other.

Under New York law, Shore, as a landowner, is subject to liability for either a public or private nuisance on its property upon learning of the nuisance and having a reasonable opportunity to abate it.[25] *See Pharm v. Lituchy,* 283 N.Y. 130, 132, 27 N.E.2d 811, 812 (1940); *Conhocton Stone Road v. Buffalo, New York & Erie*

---

**24.** We need not decide whether in the future a state's claim for response costs under CERCLA will be sufficient to support the exercise of pendent jurisdiction to seek injunctive relief. *See generally People v. 11 Cornwell Co.,* 695 F.2d 34, 40 (2d Cir.1982), *vacated in part on other grounds and remanded,* 718 F.2d 22 (2d Cir. 1983) (en banc).

**25.** We cannot agree with Shore's claim that the trend toward limiting the liability of successor landowners for the cost of abating a nuisance

supports reversal. *See Apportionment of Damages and Landowner Liability in Hazardous Waste Cases,* 12 Envtl.L.Rep. (Envtl.L.Inst.) 30,-031, 30,034 (1982). The trend toward limited liability clearly does not extend to successor owners who knew about the condition of the land before purchasing it. *See id.* In any event, Shore provides no evidence that the New York courts have recognized or would recognize the "trend."

*Railroad Co.*, 51 N.Y. 573 (1873); *New York Telephone Co. v. Mobil Oil Corp.*, 99 A.D.2d 185, 188–89, 473 N.Y.S.2d 172, 174 (1984). As noted in the *Restatement (Second) of Torts* § 839 comment d (1979) [hereinafter cited as *Restatement*]:

> [L]iability [of a possessor of land] is not based upon responsibility for the creation of the harmful condition, but upon the fact that he has exclusive control over the land and the things done upon it and should have the responsibility of taking reasonable measures to remedy conditions on it that are a source of harm to others. Thus a vendee ... of land upon which a harmful physical condition exists may be liable under the rule here stated for failing to abate it after he takes possession, even though it was created by his vendor, lessor or other person and even though he had no part in its creation.

It is immaterial therefore that other parties placed the chemicals on this site; Shore purchased it with knowledge of its condition—indeed of the approximate cost of cleaning it up—and with an opportunity to clean up the site. LeoGrande knew that the hazardous waste was present without the consent of the State or its DEC, but failed to take reasonable steps to abate the condition. Moreover, Shore is liable for maintenance of a *public* nuisance irrespective of negligence or fault. *See McFarlane v. City of Niagara Falls*, 247 N.Y. 340, 343, 160 N.E. 391, 391–92 (1928); *Schenectady Chemicals*, 117 Misc.2d at 965, 970, 459 N.Y.S.2d at 976, 979. Nor is there any requirement that the State prove actual, as opposed to threatened, harm from the nuisance in order to obtain abatement. *See Southern Leasing Co. v. Ludwig*, 217 N.Y. 100, 104, 111 N.E. 470, 472 (1916); *City of Rochester v. Gutberlett*, 211 N.Y. 309, 316, 105 N.E. 548, 550 (1914); *Wall Street Transcript Corp. v. 343 East 43rd Street Holding Corp.*, 81 A.D.2d 783, 439 N.Y.S.2d 23 (1981); *Buchanan v. Cardozo*, 24 A.D.2d 620, 621, 262 N.Y.S.2d 247, 249 (1965); W. Prosser, *Handbook of the Law of Torts* § 90, at 603 (1971). Finally, the State has standing to bring suit to abate such a nuisance "in its role as guardian of the environment." *Schenectady Chemicals*, 117 Misc.2d at 968, 459 N.Y.S.2d at 978; *accord State v. Monarch Chemicals, Inc.*, 90 A.D.2d 907, 907, 456 N.Y.S.2d 867, 869 (1982).

■ We also reject Shore's argument that its maintenance of the Shore Road site does not constitute a public nuisance. We have no doubt that the release or threat of release of hazardous waste into the environment unreasonably infringes upon a public right and thus is a public nuisance as a matter of New York law, *see Schenectady Chemicals*, 103 A.D.2d at 37, 479 N.Y.S.2d at 1013; *Monarch Chemicals*, 90 A.D.2d at 907, 456 N.Y.S.2d at 868–69, particularly in light of Title 13 of Article 27 of the New York Environmental Conservation Law, *see Restatement* § 821B comment c (statutes can indicate that conduct is an "unreasonable interference with a public right"). Shore challenges the existence of the releases or threatened releases claimed by the State. We have found, however, that several crucial facts are undisputed: the tanks have leaked and are corroding; the groundwater has been contaminated; and Shore is unwilling and unable to transform the site into a stable, licensed storage facility. It makes no difference that Shore has begun a cleanup. We simply hold that under New York law it is required to finish that cleanup.

■ The district court could have also found that Shore is maintaining a public nuisance under two alternative theories. Shore's continuing violations of N.Y.Envtl. Conserv.Law § 27–0913(1) (not having a permit to store or dispose of hazardous waste), and of *id.* § 27–0914(1) (possessing hazardous waste without authorization), if not of *id.* § 27–0914(2) (disposing of hazardous waste without authorization), constitute a nuisance per se. *See Delaney v. Philhern Realty Holding Corp.*, 280 N.Y. 461, 465, 21 N.E.2d 507, 509 (1939); *Driscoll v. New York City Transit Authority*, 53 A.D.2d 391, 395, 385 N.Y.S.2d 540, 543 (1976). And while we recognize that determining whether an activity is abnormally

dangerous depends on the circumstances, a review of the undisputed facts under the guidelines stated in *Doundoulakis v. Town of Hempstead,* 42 N.Y.2d 440, 448, 368 N.E.2d 24, 27, 398 N.Y.S.2d 401, 404 (1977), convinces us that a New York court would find as a matter of law that Shore's maintenance of the site—for example, allowing corroding tanks to hold hundreds of thousands of gallons of hazardous waste—constitutes abnormally dangerous activity and thus constitutes a public nuisance. *See Schenectady Chemicals,* 103 A.D.2d at 37, 479 N.Y.S.2d at 1013; *see also State v. Ventron Corp.,* 94 N.J. 473, 492, 468 A.2d 150, 160 (1983) (holding that "simply dumping [a hazardous substance] onto land or into water" is an abnormally dangerous activity).[26]

### D. *LeoGrande's Personal Liability*

 We hold LeoGrande liable as an "operator" under CERCLA, 42 U.S.C. § 9607, for the State's response costs. Under CERCLA "owner or operator" is defined to mean "any person owning or operating" an onshore facility, *id.* § 9601(20)(A), and "person" includes individuals as well as corporations, *id.* § 9601(21). More important, the definition of "owner or operator" excludes "a person, who, without participating in the management of a . . . facility, holds indicia of ownership primarily to protect his security interest in the facility." *Id.* § 9601(20)(A). The use of this exception implies that an owning stockholder who manages the corporation, such as LeoGrande, is liable under CERCLA as an "owner or operator." That conclusion is consistent with that of other courts that have addressed the issue. *See, e.g., United States v. Carolawn Co.,* 14 Envtl.L.Rep. (Envtl.L.Inst.) 20,699, 20,-700 (D.S.C. June 15, 1984); *NEPACCO,* 579 F.Supp. at 847–48. In any event, LeoGrande is in charge of the operation of the facility in question, and as such is an "operator" within the meaning of CERCLA.

**26.** Neither of the parties cites any New York law concerning the permissible scope of an abatement order. Nevertheless, we presume that a New York court would order removal and cle-

Turning to liability for abatement, it is debatable whether a New York court would hold LeoGrande personally liable by piercing the corporate veil. New York courts disregard the corporate form "reluctantly," *see Gartner v. Snyder,* 607 F.2d 582, 586 (2d Cir.1979), and while the State claims that LeoGrande dominated Shore and that Shore was undercapitalized, these allegations are probably insufficiently particularized. *See Walkovszky v. Carlton,* 18 N.Y.2d 414, 420, 223 N.E.2d 6, 10, 276 N.Y.S.2d 585, 590 (1966). Both the New York Court of Appeals and this court have been quite insistent that the corporate form will not be disregarded unless the opposing party shows that the corporate form is being used fraudulently or as a means of carrying on business for personal rather than corporate ends. *See Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 903 (2d Cir.1981); *Walkovszky,* 18 N.Y.2d at 418, 420, 223 N.E.2d at 8, 10, 276 N.Y.S.2d at 588–90. The State's claim has not at this stage risen to that level.

 Nevertheless, we hold LeoGrande liable for the abatement of the nuisance without piercing the corporate veil. New York courts have held that a corporate officer who controls corporate conduct and thus is an active individual participant in that conduct is liable for the torts of the corporation. *See State v. Ole Olsen, Ltd.,* 35 N.Y.2d 979, 324 N.E.2d 886, 365 N.Y.S.2d 528 (1975); *LaLumia v. Schwartz,* 23 A.D.2d 668, 669, 257 N.Y.S.2d 348, 350 (1965). We need not address whether he is liable merely as an officer of Shore, for it is beyond dispute that LeoGrande specifically directs, sanctions, and actively participates in Shore's maintenance of the nuisance. *See also Escude Cruz v. Ortho Pharmaceutical Corp.,* 619 F.2d 902, 907 (1st Cir.1980) (citing federal cases pronouncing this rule of liability for corporate officers). This general rule is particularly appropriate in the public nuisance context

anup here where the owner and operator concede that they do not intend to make the site into a safe facility.

where " 'everyone who ... participates in the ... maintenance ... of a nuisance are liable jointly and severally.' " *Schenectady Chemicals*, 117 Misc.2d at 966, 459 N.Y. S.2d at 976 (quoting 17 Carmody-Wait 2d *Actions for Waste, Nuisance and Trespass* § 107:59, at 334 (1979); *accord Caso v. District Council 37, American Federation of State, County & Municipal Employees*, 43 A.D.2d 159, 163, 350 N.Y.S.2d 173, 178 (1973).

As a final note however, the district court should take into account one additional factor in supervising its injunction, a principle limiting perhaps to some extent, LeoGrande's liability for the future costs of abatement. The injunctive remedy is an equitable one; that abatement expenses may become prohibitive and disproportionate therefore may be taken into consideration. *See Restatement, supra*, § 839 comment f; *id.* § 936.

Appellants' application for a stay pending appeal which we have held in abeyance has been dealt with in connection with their appeal, Docket No. 85–7241, from an order of contempt.

Judgment affirmed.

Oakes, Circuit Judge, filed opinion concurring and dissenting in part.